EMILY MILLER *vs.* W. T. GRANT COMPANY.

Suffolk.   February 9, 1939. — February 28, 1939.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Food.   Evidence,* Of unwholesomeness of food.

Lack of evidence, in the record of the trial of an action for breach of warranty in selling unwholesome food to the plaintiff, as to other food eaten by the plaintiff during the period of probable incubation for ptomaine poisoning or as to bad odor or bad taste of the food sold, left it a matter of conjecture whether ptomaine poisoning following partaking of the food was due to its being unwholesome and required the ordering of a verdict for the defendant.

CONTRACT OR TORT.   Writ in the Superior Court dated November 18, 1933.

A verdict for the plaintiff in the sum of $400 was returned at the trial before *Sheehan,* J.   The defendant alleged exceptions.

The case was submitted on briefs.

*E. C. McCabe,* for the defendant.

*J. Atkins,* for the plaintiff.

DOLAN, J.   This is an action of contract for breach of warranty of fitness of food sold by the defendant to the plaintiff.   At the close of the evidence the defendant filed a motion for a directed verdict in its favor.   The motion was denied, subject to the defendant's exception, and the

jury returned a verdict for the plaintiff. The writ was in "Contract or tort," and the second count of the declaration is in tort for negligence. The bill of exceptions, however, speaks of the action as one of contract for breach of warranty, and we therefore assume that the count in tort was waived. *Monahan* v. *Economy Grocery Stores Corp.* 282 Mass. 548, 549.

The evidence in its aspect most favorable to the plaintiff may be summarized as follows: On September 16, 1933, "between 3:30 and 3:45 P.M.," the plaintiff accompanied by her son "went into the cafeteria of the defendant." When seated she ordered chop suey. Noodles are customarily served with chop suey, but since the cafeteria was "out of noodles," the plaintiff received in lieu of the noodles an "extra helping" of chop suey. The order served her consisted of about ten tablespoonfuls of which she ate seven. After eating the chop suey she experienced no ill effects, but on her way home "it felt like grease coming up in her throat," and at "about 5:30 she got a terrible headache and cramps, took an alkaseltzer" and reclined for a while. She arose and felt all right except for "grease coming up in her throat," until about 11 P.M. when she went to bed. At about 1:45 the next morning she vomited and "had diarrhea." At 11 A.M. a physician visited her. He made a diagnosis of ptomaine poisoning but testified that in the light of his examination of the plaintiff and the history that he received from her, eating chop suey and becoming sick thereafter would not be adequate cause for the condition found by him. He further testified that overeating would not cause the symptoms that he found to the extent that he found them, that ptomaine poisoning is the result of putrefaction of food, that "decomposition or putrefaction of food which causes the poisoning invariably has a stench"; that he had received no history from the plaintiff "of her eating any putrefied food" "aside from what the plaintiff had told him of eating tea and toast in the morning and chop suey about four o'clock in the afternoon." He also testified that "the period of incubation is the period from the time

you come in contact with the infection until the showing up of the condition which results," and that this usually occurs within twelve hours; that it is "perfectly possible that perfectly healthy foodstuff may cause food poisoning"; and "that it was possible for the plaintiff to have received the abdominal infection that he found from food which she had partaken of twenty-four hours previous to the onset of the illness . . . ." The plaintiff's son, who accompanied her to the cafeteria, testified that she received an extra portion of chop suey, "he wouldn't call it a good generous serving"; that it was served from a galvanized tin container; that he "heard no complaint from his mother" "while she was eating" the chop suey; that "they then went straight home," but that on the way home he observed that the plaintiff "belched" occasionally. There was evidence that the plaintiff vomited frequently for about three days after the onset of her illness and was confined to her bed for about two weeks.

The burden of proving that her illness was due to unwholesomeness of the chop suey was an affirmative one resting on the plaintiff which could not be left to surmise, conjecture or imagination. While she was not bound to exclude every other possibility of cause for her illness, she was required to show by the evidence a greater likelihood that her illness resulted from unfitness or unwholesomeness of the food served to her by the defendant, rather than from a cause for which the defendant would not be liable. *Rocha* v. *Alber, ante,* 155, 157, and cases cited. We are of opinion that the evidence most favorable to the plaintiff did not afford a basis for more than a conjecture that her illness was due to an unfit condition of the chop suey. There was no evidence to show what other food the plaintiff may have partaken of during the period testified to by the physician as the one of probable incubation in cases of ptomaine poisoning, except that the plaintiff's breakfast on the day involved had consisted of toast and tea. What she may have eaten between that time and the time when she ate the chop suey was left to conjecture. There was no evidence that the food "tasted bad," or that

it had the appearance of unfitness. *Monahan* v. *Economy Grocery Stores Corp.* 282 Mass. 548, 550–551, and cases cited. Nor was there evidence that any bad odor arose therefrom, such as the physician testified invariably accompanies putrefied food. The defendant's motion for a directed verdict should have been allowed. The entry will be

*Exceptions sustained.*
*Judgment for the defendant.*