[Civ. No. 7243. Third Dist. Apr. 23, 1946.]

JIM DOUGHERTY, JR., Respondent, v. JOHN E. LEE, Appellant.

F. M. Brack for Appellant.

Wm. N. Graybiel for Respondent.

THOMPSON, J.—The defendant has appealed from a judgment of $678 which was rendered against him as damages for the breach of an implied warranty. The plaintiff lost seven dairy cows which died from botulism poisoning alleged to have resulted from eating hay purchased from the defendant. It is not contended the judgment is excessive. The appellant concedes that the only issue on appeal is whether there is substantial evidence to support the finding that plaintiff's cows died as a result of poison contained in the hay which he purchased from the defendant.

The plaintiff maintained a small dairy consisting of twenty head of cows which, for several days prior to the poisoning, he kept in a corral where there was no pasturage or other feed to which the cows had access. In the latter part of October, 1944, he purchased from the defendant one ton of baled Sudan hay. The defendant recommended the purchase of the Sudan hay rather than alfalfa hay. The following morning, at about seven o'clock, the plaintiff opened two or three bales and fed it to the cows in the corral. He fed some of the same hay again that evening. The following morning he found five dead cows in the corral. Three other cows were "slobbering" at the mouth and staggering around in the corral. Two of the sick cows soon died. The other one finally recovered. The plaintiff promptly called a veterinarian from Turlock who performed a post-mortem examination of one of the cows. He took the contents of the stomach, a portion of the liver and a sample of the hay from the center of an unopened bale, together with some water from the water-

ing-trough, and sent them in separate glass jars to the Mossman Clinical Laboratory for analysis. Doctor W. G. Mossman testified that he made a chemical analysis of the contents of the stomach and of the liver and found that they contained botulism bacilli, commonly found in canned vegetables, hay and grain; that he injected the poison into a guinea pig and "positively identified the organism" as botulism bacilli. The analysis of the hay was not so conclusive. But he did make a bacteriological examination of the hay. He said in that regard: "In the event I had positive findings on the bacteriological examination, I wouldn't do any chemical analysis on it because I didn't feel it was necessary. If I found botulism bacilli, that would be self explanatory. It wouldn't be necessary to do the chemicals." Regarding the analysis of the sample of hay he said: "I found some organism that looked like botulina bacilla." He said that the bacilli develops in contaminated fruit or in mouldy deteriorated hay, very rapidly and discharges a toxin excretia which may result in death within twenty-four hours or possibly in four or five days. He also said the victim might show symptoms of the disease by frothing at the mouth, by blurred eyesight and unsteady, wobbling legs.

The sick cows had those symptoms. The veterinarian testified to that fact. There can be little doubt that the cows died from poisoning within a few hours after eating the hay purchased from the defendant. The bales were opened and fed to them in the corral. We are also of the opinion there is substantial evidence that the hay contained botulism poison. In addition to the evidence of the pathologist that he found in his analysis of a specimen of the hay what "looked like botulina bacilla," the veterinarian testified without objection that plaintiff told him the cattle had been kept in the corral for several days before they were fed the hay in question, during which time they had not been pastured. He examined the corral, and the sick cow, with a view of determining the cause of the death of the seven cows. He said that he was suspicious they died from botulism poisoning. No evidence was adduced to indicate that the cows had access to any other food in the corral or elsewhere, from which they could have been poisoned. It seems quite persuasive that the hay contained the poison which killed the cows, since not one, but seven of them, died within a few hours after eating the hay, and that no other character of food was found in the corral.

It is true that after the defendant learned of the report of the cause of the death of plaintiff's cows, he sold some fifty tons of baled hay from the same stack to other persons, five of whom testified that they fed the hay to their cattle without any bad result. But it is also true that the defendant sold the hay to those purchasers at a greatly reduced price. He charged plaintiff $28 per ton, and he subsequently sold hay to the other persons for $18 per ton. It does not appear whether they first opened the bales and exposed the hay to the light and sun before they fed it to their stock. In support of the judgment, we may assume that they did so. The evidence is uncontradicted that the opening and exposing of the hay to the light and sun for several hours will effectively destroy the poisonous germs. The defendant testified that he had a first cutting of his hay which was prematurely baled before it was thoroughly dry. That would cause it to sweat, mould and deteriorate.

It is true, as the appellant earnestly and plausibly argues, that pea-vines, bean-stalks, cabbage heads and other vegetables, packed and stored so as to exclude the sun and air, may retain moisture and develop bacillus botulinus to a dangerous extent. But the evidence in this case reasonably infers that the plaintiff's dairy cows did not have access to any such poisonous vines or vegetables. The evidence might have been more definite in that regard. But we think there is sufficient evidence to reasonably support the finding of the court that the cattle died as a result of eating the hay purchased from the defendant and that it contained that poison.

Of course the burden was on the plaintiff to show by a preponderance of the evidence that the hay which he purchased from the defendant contained poison which killed the cows. But it was not necessary for the plaintiff to furnish evidence which absolutely precluded the possibility of the cattle procuring some other poisonous food. The case of *Monahan* v. *Economy Grocery Stores Corp.*, 282 Mass. 548 [185 N.E. 34], upon which the appellant relies, properly stated the rule requiring the plaintiff to establish a prima facie showing, in a case of this nature, that the food in question is poisonous or deleterious. The court said in that regard:

''The plaintiff was not bound to exclude every other possible cause for his illness, but he was required to show *that the probable cause* was the unwholesomeness of the corn.

(Citing authorities.) In our opinion, the evidence did not afford a basis for more than a conjecture that the corn was unwholesome and that the plaintiff's illness was due to the corn rather than to other food or drink partaken by the plaintiff and his wife or to intestinal influenza." (Italics added.)

In the Monahan case, *supra,* judgment for the defendant was affirmed. That was a suit for damages for breach of implied warranty of the fitness for human consumption of canned corn purchased by the plaintiff, from which she made and ate chowder. It was alleged the canned corn contained ptomaine poison. Twelve hours after eating the chowder the plaintiff became ill, suffering severe pains in her stomach and vomiting. She testified that the chowder "looked, smelled and tasted good." None of the chowder or canned corn was analyzed or examined. Plaintiff's physician testified that "every symptom of the plaintiff and his wife was consistent with intestinal influenza, and that their subnormal temperature was inconsistent with food poisoning." The judgment for the defendant was therefore affirmed.

In the case of *Barham* v. *Widing,* 210 Cal. 206 [291 P. 173], the Supreme Court quoted with approval from the opinion of this court regarding the rule with respect to the burden of proof and the sufficiency of the evidence to establish the negligence of a dentist in using an improper solution or an unsterile hypodermic needle in treating an infected jaw after an ulcerated tooth had been removed. Infection followed and the plaintiff was seriously damaged. It was contended that the plaintiff was what is commonly termed "a bleeder," and that the evidence did not show that the infection and damage was the result of the negligent use of an unsterile needle or contaminated solution. Judgment for the plaintiff was affirmed. Regarding the sufficiency of the evidence required of the plaintiff to establish a case of negligence under such circumstances the court said at page 215:

"It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment. (*Ley* v. *Bishopp,* 88 Cal.App. 313, 316 [263 P. 369].)"

Suits for damages resulting from partaking of poisoned

food, whether they are based on negligence or upon a breach of implied warranty, are closely allied, and we assume the foregoing rule would apply to both classes of cases.

For the purpose of this appeal the appellant concedes that the hay, which is involved in this suit, was sold by the defendant with the implied warranty provided for in section 1735 (1) of the Civil Code that it was reasonably fit for the purpose of feeding the dairy cows.

Where the evidence is susceptible of a reasonable inference that death or illness resulted from the eating of contaminated food, a prima facie case of negligence or of a breach of implied warranty of the fitness of the food, has been established, and it is erroneous for the court to direct a verdict for the defendant. Under such circumstances a judgment for the plaintiff on that issue should not be disturbed on appeal. (*Klein* v. *Duchess Sandwich Co., Ltd.,* 14 Cal.2d 272 [93 P.2d 799]; *Jensen* v. *Berris,* 31 Cal.App. 2d 537 [88 P.2d 220]; *Stell* v. *Townsends California Glace Fruits, Inc.,* 138 Cal.App.Supp. 777 [38 P.2d 1077].)

In the present case plaintiff's dairy cows were confined in a corral where they had no access to other food. Seven of them died within twenty-four hours after eating baled Sudan hay purchased from the defendant immediately before that time. A post-mortem examination and pathological and chemical analyses of the contents of the stomach and of a portion of the liver of one of the dead cows disclosed, without conflict, the presence of botulina bacilla, and the symptoms of the sick cows indicated that they were suffering from the effect of the same poison. An analysis of a sample of the same hay resulted in the discovery of "what looked like botulina bacilla." In our opinion that showing established a prima facie case of death of the seven cows from poison contained in the recently purchased hay, as the court affirmatively determined. Under such circumstances we may not disturb the findings and judgment on this appeal.

In support of appellant's contention that the evidence in this case does not prove the cows died as a result of poison contained in the hay which he sold plaintiff, the following cases are cited: *Miller* v. *W. T. Grant Co.,* 302 Mass. 429 [19 N.E.2d 704], *Gracey* v. *Waldorf System, Inc.,* 251 Mass. 76 [146 N.E. 232], *Geisness* v. *Scow Bay Packing Co.,* 16 Wn.2d 1 [132 P.2d 740], and *Reese* v. *Smith,* 9 Cal.2d 324

[70 P.2d 933]. Those cases involved illness or death resulting from eating alleged contaminated food which was unfit for human consumption, and sold contrary to the implied warranty of fitness for that purpose. Judgments for the plaintiffs were reversed for lack of adequate proof that the food was deleterious. Each of those cases may be readily distinguished upon the facts from the present action. In none of them, with the exception of one, was the food or the contents of the stomachs of the victims analyzed by a pathologist or by any other scientist. The plaintiffs relied upon the sufficiency of the evidence, in each case, merely showing that illness or death followed the eating of the food within a few hours. If there was evidence of ptomaine poisoning, there was no proof that the victims had not eaten other food which was poisonous either before or after partaking of the food in question. In some of those cases the symptoms were found to have refuted the contentions that the victims were ill or died as a result of eating poisoned food. In one case the evidence of the plaintiff's family physician rebutted the theory of ptomaine poisoning. In the Geisness case, a physician testified positively that Mrs. Wright did not die from eating canned salmon, but that she died from pneumonia, as her family physician certified.

In the Reese case a judgment for plaintiff was reversed. Two justices dissented. The plaintiff contended that she was rendered ill from eating pork sausages, upon some of which there were maggots. She testified that she became ill and suffered pains in her stomach within a few minutes after eating the sausages. Without examination of the food, her physician said that he diagnosed her illness as the result of botulism. A subsequent examination and analysis by the Los Angeles Health Department of some of the same sausages which were left in an ice box disclosed the fact that the sausages contained no maggots, but appeared to be fresh and wholesome, and that "no organism of the food poisoning groups were present." It affirmatively appeared that botulism poisoning will not manifest itself *for several hours* after the deleterious food is eaten. The reviewing court said that, even if maggots were on some of the sausages, it did not necessarily prove that the food was deleterious; that maggots "are but the larvae of insects," and may be present on the food without necessarily resulting in poisonous germs. The court concluded that the evidence

lacked proof of botulism poisoning, upon which the plaintiff relied, and the judgment was therefore reversed on that ground.

The foregoing cases are not authorities which are conclusive under the circumstances of this case. The proof of the presence of poisoning in the baled hay is much more convincing in this case.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied May 23, 1946.