Ivan BORMAN, Respondent,

v.

Clifford O'DONLEY, Appellant.

No. 23616.

Kansas City Court of Appeals.

Missouri.

Dec. 3, 1962.

Don C. Carter, Sturgeon, for appellant.

Hendren & Andrae, Jefferson City, W. Frazier Baker, Fulton, for respondent.

CROSS, Judge.

This case was tried to a jury which returned a verdict awarding plaintiff Ivan Borman $7000.00 damages for losses allegedly sustained as a result of feeding his dairy cattle a quantity of silage, purchased from defendant Clifford O'Donley, which was unfit for animal consumption. The jury additionally awarded plaintiff interest in the sum of $1277.50. Defendant's motion for a new trial was overruled on the condition that plaintiff file a remittitur of the interest. Plaintiff duly entered the remittitur and the trial court entered judgment for plaintiff in the amount of $7000.00. Defendant has appealed.

The case was tried upon plaintiff's amended petition which alleged, in essential substance, that defendant sold plaintiff certain silage; that at the time of the sale defendant knew that plaintiff intended to use the silage as feed for dairy cattle and represented and warranted, both expressly and impliedly, that the silage was suitable for that intended purpose; that plaintiff, relying on defendant's representations and warranties, bought the silage from defendant for the price of $940.00; that thereafter plaintiff fed some of the silage to his dairy cattle; that the silage was not suitable for dairy cattle feed, as warranted, and contained a toxic substance that rendered it harmful and dangerous to the dairy cattle—a fact that defendant knew or had reasonable cause to know; that as a result, 53 head of plaintiff's dairy cattle died, the value of the other cattle was depreciated, the milk production from his dairy herd was reduced, and, that he had paid out $940.00 for silage of no value.

The case was submitted to the jury under instructions substantially incorporating the theory of recovery alleged in plaintiff's petition.

One of defendant's contentions is that the trial court erred in overruling his motion for a directed verdict at the close of all the evidence because there was no substantial evidence on which a verdict could be had. It is elementary that in determining such issue we must consider the evidence in the light most favorable to plaintiff, must accord to him the benefit of all supporting inferences fairly and reasonably deducible from the evidence, and must disregard defendant's evidence except insofar as it may aid plaintiff's case. La Plant v. E. I. Du Pont De Nemours and Co., Mo.App., 346 S.W.2d 231. Reviewed in accordance with the foregoing rule, the evidence tends to establish facts and circumstances which we here set out.

Plaintiff owned and resided on a Callaway County farm where he maintained a herd of registered Holstein dairy cattle, which, in 1954, consisted of approximately one hundred calves, heifers, cows and bulls. He was engaged in the dairy business and

was milking about 59 cows in that enterprise. During 1954, animal feed was in short supply because the summer was hot and dry and there was little pasturage. As a result it became necessary for him to purchase feed for his dairy herd.

Defendant also owned and lived on a farm, near plaintiff's. In 1954 he planted 300 acres of corn that failed to mature because of the drought. He cut the crop and put it in a silo on his farm. He additionally acquired an unmatured corn acreage from a neighbor, Clay Moore, which he ensiled and put in a trench silo on Moore's farm. Some time prior to October 28, 1954, defendant learned that the Department of Agriculture of the University of Missouri had issued warnings to the effect that there was danger of nitrate poisoning from feeding silage made in 1954 from corn grown on heavily fertilized soil. He took a sample of the Clay Moore silage to the Department of Agricultural Chemistry of the University of Missouri for "evaluation". Dr. Muhrer, head of the Department, and Dr. Garner, Associate Professor of Agriculture, made a qualitative analysis of the silage, after being told by defendant that the field from which it came had been heavily fertilized, and found that "The nitrate content was positive". Dr. Muhrer testified that he told defendant the silage was potentially dangerous. Defendant testified, "He (Dr. Muhrer) told him it had some nitrate and he said it could be fatal". Dr. Muhrer then sent defendant to Dr. Gehrke, Professor of Agricultural Chemistry in charge of the University's Station Laboratory, to have a quantitative analysis made of the silage sample in order to find out the exact amount of its various elements. At that time, Dr. Muhrer told defendant, "When you find out the exact amount of the various constituents of the ration come back and we will give you further information". Dr. Gehrke made the analysis, ascertained the water, protein and nitrogen nitrate content of the sample, and informed defendant of the result by a letter dated October 28, 1954, in which Dr. Gehrke made no evaluation of

the effect or significance of the nitrogen nitrate content. Defendant never returned to Dr. Muhrer or Dr. Garner after receiving the quantitative report from Dr. Gehrke.

A short time after receiving the report of Dr. Gehrke's test, and at plaintiff's farm, defendant proposed to sell plaintiff the silage from the Clay Moore farm. A few days later, plaintiff went over to defendant's place to discuss the transaction further. He asked defendant whether the silage had been tested. Defendant said that he had had it tested at the University and that the test showed it was low in nitrate and all right to feed. Plaintiff inquired if fertilizer had been applied to "that field" and defendant told him there had been none. Defendant offered to show plaintiff "the paper" (the Gehrke test), but plaintiff declined and said, "Unless I had some help with it I didn't think I was chemist enough that I could understand everything that was said on it". Plaintiff testified, "If he told me the feed was O. K., it was all right with me. He was a neighbor of mine and I would take his word for it", and, "I told him, and I presumed he knew, that it was going to be fed to my dairy herd". Defendant did not divulge to plaintiff that Dr. Muhrer and Dr. Garner had tested the silage and had told him that it contained nitrate, was potentially dangerous and that it could be fatal. Plaintiff bought the silage and paid defendant $940.00 for it. Defendant admitted that when the sale was made, he was aware of the dangers of nitrate and knew plaintiff was going to feed the silage to his cattle.

Plaintiff began to haul the silage and feed it to his cattle in the latter part of December, 1954, or the first part of January, 1955. Prior to that time the dairy herd was in good health, in "excellent condition". They "ate normally", "looked like typical Holstein cattle", and were "very shiny and not rough". Their (milk) production was "good to very good". They were not having any trouble breeding and dropping their calves. Mr. Caldwell, the official tester for the University of Missouri sponsored Dairy

Herd Improvement Association, testified from his records that plaintiff received rather good (milk) production from his cows. Total milk sales in September, October, and November of 1954 amounted to $10,146.38.

After feeding the silage through January, 1955, the cattle began to look in bad condition. Their hair became long, shabby, dull and rough, and their eyes appeared dull. They lost weight and their ribs showed. They appeared weakened and were listless. They ate with ravenous appetites, and were fed large amounts of grain and hay as well as the silage, but became "worse and worse". "The milk production was dropping all the time", although "their appetites was increasing all the time". Their milk production started to get bad—"sort of like a mastitis"—and "dropped way down to nothing". After these conditions developed in his herd, plaintiff took a sample bucket of the silage to the University to have it tested. Dr. Muhrer made the test and informed plaintiff that the silage contained nitrate and that it was dangerous to use. Plaintiff then (about the middle of February, 1955) stopped feeding the silage to his cows. He also requested of defendant that he return the purchase price of the silage. Defendant refused to do so.

Because feed was short plaintiff continued to feed limited amounts of the silage to his heifers until the middle of April, at which time he entirely discontinued feeding the silage after having fed approximately one-half of it. The condition of the herd became worse. Cows that formerly had no difficulty in calving gave birth to calves that died shortly after their delivery. Plaintiff lost a number of calves in the early part of 1955, and again a large number of calves in the fall of 1955. Also in 1955, plaintiff lost a cow. In 1956 he lost additional calves and a number of cows that died in the forepart of the year. Plaintiff testified that the reasonable market value of the dead cattle was $18,500.00 and that the remaining herd was reduced in value to the extent of $16,000.00 by the effects of the nitrate in the silage. Also, it was shown by the records of the Dairy Herd Improvement Association that milk production of the herd declined by 79 per cent. Plaintiff testified his loss thereby was $15,000.00. Eventually plaintiff sold the herd, sold the farm and moved away.

Plaintiff testified that he was an experienced dairyman, familiar with the diseases of dairy cattle, and that he knew his sick cattle, including those that died, were afflicted with nitrate illness, because he knew the symptoms. Dr. Muhrer testified as an expert in the field of nitrate and its effects. He stated that in dry years, when no ears of corn were produced, the nitrate would stay in the stalk. It is then dangerous because it is in a toxic form. One of the first symptoms of nitrate poisoning is "a very dead cow" if the nitrate concentration is sufficient. In nitrate toxicity the cow slowly starves to death because of a Vitamin A deficiency which causes a decrease in milk production and in the general thriftiness of the animal, followed by staggering and loss of eyesight, and eventually by death—"it might be a year or two years". In answer to hypothetical questions, generally incorporating the facts herein set out, Dr. Muhrer stated that in his opinion the cause of the illness and death of plaintiff's cattle and the decrease in milk production was due to the high nitrate content of the silage. Plaintiff had autopsies performed on several of the cattle that died. The results indicated that the animals had starved to death from a deficiency of Vitamin A, caused by the toxic effect of nitrates.

■ The substance of defendant's first point is that the trial court should have directed a verdict in his favor because there was no credible evidence to permit a finding that the sickness and death of plaintiff's cattle resulted from eating the silage. Defendant admits there is evidence that plaintiff's cattle ate the silage and that there was nitrate in it, but argues that a jury verdict would be based on "guesswork, surmise and conjecture", because there was "never any

autopsy or post mortem made on any of the cows". That argument fails because it is established by plaintiff's testimony and by documentary evidence in the form of an autopsy report by Dr. Kentner, of the Missouri University School of Veterinary Medicine, that plaintiff had autopsies performed on some of his dead cattle and that the results thereof showed the conditions we have heretofore noted in our narration of the evidence. Further arguing the point, defendant suggests other matters of defense that are clearly not for our consideration but were for the jury to determine. Paraphrasing the language of Judge Stone in La Plant v. E. I. Du Pont De Nemours and Co., Inc., Mo.App., 346 S.W.2d 231, (a case involving the death of cows from alleged nitrate poisoning), we deem it sufficient to say that "we are satisfied that, upon the record presented, the issue as to whether plaintiff's cows died of nitrate poisoning from eating (the silage) was for the jury and may not be ruled as a matter of law."

Defendant's second assignment charges the court with error in giving plaintiff's verdict directing Instruction No. P–1, the text of which is as follows:

"The Court instructs the jury that if they find and believe from the evidence in this case that on or about November 12, 1954 the Plaintiff, Ivan Borman, was the owner of a herd of dairy cattle in Callaway County, Missouri and that the Defendant, Clifford O'Donley, sold to Ivan Borman silage and that Clifford O'Donley at the time of the sale knew that this silage was to be used for the feeding of Ivan Borman's dairy cattle, then you will find that there was an implied warranty on the part of Clifford O'Donley that the silage was fit for the feeding of Ivan Borman's dairy cattle, or,

"If you find and believe from the evidence that at or before the sale of the silage Clifford O'Donley represented to Ivan Borman that this silage was fit for the feeding of Ivan

Borman's dairy cattle you will find that there was an express warranty on the part of Clifford O'Donley that the silage was fit for the feeding of Ivan Borman's dairy cattle, and,

"If you further find that there was either an implied warranty or expressed warranty on the part of Clifford O'Donley that the silage was fit for the feeding of Ivan Borman's dairy cattle and if you further find and believe from the evidence that Ivan Borman relied upon such warranty and that this silage was not in fact fit for the feeding of Ivan Borman's dairy cattle in that it contained nitrates that caused harm to Ivan Borman's dairy cattle as a direct and proximate result, then,

"You will find the issues for the Plaintiff, Ivan Borman, and against the Defendant, Clifford O'Donley".

Defendant first argues that the instruction is erroneous in that it permitted the jury to find for plaintiff on either an express warranty or an implied warranty, or both, as to the fitness of the silage for consumption by dairy cattle, when there is no implied warranty in this state that corn silage is fit for that intended purpose. Defendant concedes that plaintiff was entitled to a submission on the basis of an *express* warranty. Therefore, we are presently concerned only with the question of whether or not, under Missouri law, there is an *implied* warranty in the sale of corn silage that such product is fit for animal consumption.

█ It has long been an established rule in Missouri that in a sale of food for immediate human consumption there is generally an implied warranty that the food is wholesome, is fit for the purpose, and is of merchantable quality. Midwest Game Company v. M. F. A. Milling Co., Mo.Sup., 320 S.W.2d 547; Carter v. St. Louis Dairy Company, Mo.App., 139 S.W.2d 1025. In two decisions the Supreme Court has extended the foregoing rule so as to

include an implied warranty in the sale of food for animals. In Midwest Game Co. v. M. F. A. Milling Co., supra, the Supreme Court said: "Defendant has pointed out that in some states it has been held that an implied warranty of fitness does not attach to the sale of food for animals. The cases of Kroger Grocery & Baking Co. v. Woods, 205 Ark. 131, 167 S.W.2d 869, and Royal Feed & Milling Co. v. Thorn, 142 Miss. 92, 107 So. 282, so hold. To the contrary, however, see Judd v. H. S. Coe & Co., 117 Conn. 510, 169 A. 270, and Larson v. Farmers' Warehouse Co., 161 Wash. 640, 297 P. 753.[1] It is our view that an implied warranty should at least attach in cases like the instant one where the food is not in its raw state but has been processed and packaged by the manufacturer." In accordance with the quoted statement, the court held that an implied warranty of fitness accompanied the sale of processed and packaged fish food. In Albers Milling Co. v. Carney, Mo.Sup., 341 S.W.2d 117, the Supreme Court ruled that there was an implied warranty that processed turkey feed sold in sealed bags was wholesome and fit for use as feed for turkeys.

The Midwest and Albers cases decided one proposition: that there is an implied sales warranty as to the fitness and wholesomeness of *processed* animal foods. In both cases, the Supreme Court refrained from deciding whether the implied warranty doctrine attached in the sale of animal food in its raw state. It is conceded by defendant "that a seller of *proc-*essed animal feed is liable as on an implied warranty of fitness, etc."

■ Defendant assumes in his brief that corn silage is a "raw agricultural product" and urges this court to interpret the Midwest and Albers opinions as holding, at least by implication, that no implied warranty would accompany a sale of animal food "in its raw stage". Plaintiff strongly contends that corn silage is not a raw agricultural product, but is a *processed product*—a food for animal consumption that comes within the specific class of products which carry the implied warranty. Consequently, the first subject of our inquiry will be as to the nature of the silage—whether it is "in its raw state" or is a processed product.

The word "raw" is defined by Webster's New International Dictionary as "In, or nearly in the natural state; little changed by art; unwrought; as, *raw* material", and by the Funk & Wagnalls New Standard Dictionary as "In a natural condition, unmodified from a crude state; ".

The word "processed' is derived from the transitive verb "process" which is defined by Webster's New International Dictionary as "to subject to some special process or treatment. Specif.: a. to heat, as fruit, with steam under pressure, so as to cook or sterilize. b. To subject (esp. raw material) to a process of manufacture, development, preparation for the market, etc.; to convert into marketable form, as livestock by slaughtering, grain by milling, cotton by spinning, milk by pasteurizing,

---

[1] The following cases hold that a seller of feed for consumption by animals is bound by an implied warranty that the product is fit for the intended purpose: Bradford v. Moore Brothers Feed & Grocery, 268 Ala. 217, 105 So.2d 825 (stock food for cattle); French v. Vining, 102 Mass. 132 (hay for cows); Dougherty v. Lee, 74 Cal.App.2d 132, 168 P.2d 54 (hay for cows); Doane v. Farmers Cooperative Co., 250 Iowa 390, 94 N.W.2d 115, 81 A.L.R.2d 128 (corn for cattle); Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co., 123 Mont. 396, 217 P.2d 549 (oil cake pellets for sheep); Libke v. Craig, 35 Wash. 2d 870, 216 P.2d 189 (hay for horses); International Milling Co. v. Jernigan, Tex.Civ.App., 191 S.W.2d 526 (bran for hogs); McBride v. Farmers' Seed Association, 248 Ky. 514, 58 S.W.2d 909 (chicken feed); Thatcher Milling & Elevator Co. v. Campbell, 64 Utah 422, 231 P. 621 (wheat for chickens); Larson v. Farmers' Warehouse Co., 161 Wash. 640, 297 P. 753 (hay for cows); Judd v. H. S. Coe & Co., 117 Conn. 510, 169 A. 270 (feed for horses).

fruits and vegetables by sorting and re-packing;—in past part. often distinguished from *raw*". The latter definition is quoted in numerous decisions from various jurisdictions.

In Zeigler v. People, 109 Colo. 252, 124 P.2d 593, the court stated that "processing" is some change made in the natural product after it is grown. In Corn Products Refining Co. v. Federal Trade Comm., C.C.A. 7, 144 F.2d 211, it was said, "(processing) is an act or a series of acts with regard to the subject matter in its transformation into a different state or a different thing. It effectuates change in form, contour, chemical combination, physical appearance or otherwise by artificial or natural means". In Gulf Oil Corp v. City of Philadelphia, 357 Pa. 101, 53 A.2d 250, 172 A.L.R. 302, it was held that "[p]rocessing is a flexible term and may refer to either chemical or physical changes". The word "process" is a mode of treatment of certain materials to produce a given result. France Co. v. Evatt, 143 Ohio St. 455, 55 N.E.2d 652. And, a "process" is said to be a mode, method or operation, whereby a result or effect is produced. Kelley v. Coe, 69 App. D.C. 202, 99 F.2d 435. In Puerto Rico Tobacco Marketing Cooperative Association v. McComb, Dist. of Puerto Rico, C. C.A. 1, 181 F.2d 697, it was held that "the stemming and fermenting of leaf tobacco are operations which change the form and nature of the tobacco and is a processing operation" since the process of fermentation "produces a chemical change in the tobacco by making it milder and sweeter". In the course of its opinion, the court said: "There can be no doubt that Indian corn ceases to be in its natural state as soon as it is ground".

For a definition of "silage" we again look to Webster's New International Dictionary. That authority states that silage is "fodder (as of field corn, sorghum, grass, or clover) either green or mature converted into succulent winter feed for livestock through processes of fermentation usually by being cut fine and blown into an airtight chamber (as a silo) ,where it is compressed to exclude air and where it undergoes an acid fermentation that retards spoiling—called also ensilage". The same lexicon defines "ensile" as "to prepare (fodder) usually by chopping and storing so as to exclude air by compression in a tight silo or pit often with additives (as certain acids, preservatives, or carbohydrates) so as to induce conversion to silage". "Ensilage" is defined as "the process of preserving fodder by ensiling".

A comprehensive article on "Silage" is contained in Chamber's Encyclopaedia, 1959 Edition, from which we quote the following excerpt:

"SILAGE is the product obtained by the carefully controlled fermentation of a green fodder crop; if it is well made it should contain at least 80% of the nutrients in the original crop. The process is spoken of as ensilage or silage-making and the container in which it is carried out is a silo. Silos may vary from a pit or depression in the ground to special structures called tower silos made of wood, metal or concrete and capable of holding over 200 tons of silage. Simple portable silos have been used on small farms.

"During fermentation heat develops: if this is too great the silage loses in feeding value and digestibility. It is therefore necessary to restrict the amount of air present to keep the temperature below 100° F by packing the green crop carefully and trampling it thoroughly. It is also necessary to ensure the formation of acids at an early stage, to prevent slimy, evil-smelling silage. The acidity is due to the formation of lactic acid by the fermentation of sugary or carbohydrate material. To ensure an adequate supply of fermentable material the crop would have to be cut at an advanced stage of growth: if young, leafy, protein-rich material is to be preserved

(and this is the best food for stock) some stimulus has to be given to the formation of lactic acid. If sugar or, preferably, molasses is added an active fermentation takes place and preservation is efficient. Alternatively hydrochloric or sulphuric acid or acid mixtures may be added direct. A weak solution is sprinkled on during the filling of the silo. This has proved most efficient though in many countries distribution of the concentrated acid to farms has proved impracticable and uneconomic, and the slightly less efficient molasses process has been employed.

"Great care has to be taken in sealing the mass and a top layer of soil is usually added to exclude air and rain and to weigh the material down. If this is not done there may be heavy losses due to wastage at the edges. Silage is sometimes made in a stack, but this calls for great skill as air can easily enter at the edges, resulting in a high temperature with consequent losses.

"One advantage of silage is that the original crop can be cut at an early stage when it is rich in protein and mineral matter and when conditions are not suitable for its preservation as hay. Another advantage is that silage-making is independent of the weather. The retention of the crop's vitamin content makes silage a good food for young stock and dairy cattle, the vitamin A value being transmitted to the milk".

We derive further information on the subject of silage, and the processes involved in its making, from official State Bulletin 696 published by the Agricultural Experiment Station of the University of Missouri, which states, in part, as follows:

"Silage making involves bacteriological and chemical changes. Acid production which prevents the growth of undesirable bacteria and prevents

rotting (putrefaction) is the most important. Good quality silage is characterized by a mild, pleasant aroma, slightly acid taste, green color, and freedom from mold and sliminess.

\* \* \* \* \* \*

"In order to understand how the ensiling process helps preserve nutrients let us first consider what happens in the silo.

"When a green forage is well compacted in a silo the living plant cells continue to respire or breathe for a short time, perhaps five hours. During this time the oxygen entrapped in the silo is used up and carbon dioxide is given off. It is also during this period that heat is produced, the amount being related to the available oxygen and thus to the size of the particles and degree of compression. After the oxygen is used the second and most important phase of silage making begins. This involves lactic acid fermentation and is carried on by lactic acid bacteria which attack the soluble carbohydrate in the plant cells and convert it to lactic acid and other organic acids. This phase is usually complete in two or three days and at the end of this period the lactic acid content is about one to 1.5 percent of the fresh material.

"The mass is quite acid and has a pH of about four. When this amount of acid has been formed, fermentation is checked and after two to three weeks practically all action has ceased. If fermentation has been successful and air is excluded the silage will then keep indefinitely".

We learn additionally from the testimony of Dr. Muhrer that silage making involves a chemical reaction which converts "cyanal glycaucides" to "hydrogen cyanide", and "an enzyme type reaction".

It is convincingly demonstrated by the foregoing authority that the making of

corn silage is an operation of considerable complexity and that the silage itself is the product of various processes—some of which involve human effort and skill—others, the phenomena and reactions of nature. We observe: (1) the process of cutting or shredding the fodder—transforming the whole plant from its raw or natural state into a finely chopped mass; (2) the process of filling the silo with the material and excluding the air; (3) the process of compressing the mass; (4) the process (probably optional) of adding chemical substances or sugars to stimulate fermentation; (5) the process of developed heat; (6) the process of fermentation; and (7) the processes of "bacteriological and chemical changes". The end result of all the foregoing is a finished food product bearing little resemblance to the raw plant from which it evolved—vastly changed in its physical and chemical properties.

What has been stated above, in reference to silage generally, is applicable specifically to the silage in this case. It is shown by the evidence or reasonably inferable therefrom that all the operations and reactions described by the authorities as incident to the production of silage were involved in the making of the silage defendant sold to plaintiff (except that there is no testimony to show whether its fermentation resulted naturally or was aided by additives).

It is inescapably our conclusion that corn silage is a processed animal food. We specifically rule that the corn silage involved in this case was not a raw agricultural product in its natural state, but that it was a processed product intended for use as animal food. Consequently, an implied warranty that it was fit and wholesome for that purpose accompanied its sale. In the absence of any necessity for so doing, we abstain from determining whether the implied warranty attaches in the sale of raw agricultural products intended for consumption as animal food. In conclusion, we rule that Instruction No. 1 is not erroneous for the reason asserted in this assignment.

■■■ Defendant challenges the propriety of Instruction P–1 on other grounds, arguing first that the instruction is erroneous in that it failed to require a finding that plaintiff's cattle ate the silage. The contention is without merit. There was no dispute or controversy as to whether the silage was fed to plaintiff's herd. When defendant was asked if he knew plaintiff was going to feed the silage to his cattle, he testified, "Sure, I didn't know anything other for him to do with it." The record is replete with testimony that the cattle ate the silage. It is elementary that when a particular fact is not treated as a real disputed question, the trial court may assume the existence of such fact and omit it from the instructions. See the numerous cases so holding cited and digested in 27 Mo. Digest, Trial, ■■■

■ Defendant further insists that Instruction P–1 is erroneous because it failed to require a finding that feeding the silage caused the damage to plaintiff's cattle, and because it assumes the silage contained nitrates and that it caused harm to the cattle. These complaints are hypertechnical and have no merit. A fair reading of the instruction discloses that it did not assume the facts above referred to, but required a finding thereof by the jury. The test of the correctness of an instruction depends on how it will be understood by average men who compose juries. Lewis v. Zagata, 350 Mo. 446, 166 S.W.2d 541. It is our opinion that reasonable men sitting as a jury would interpret Instruction P–1 as requiring them to find the existence of the facts in question before they were permitted to return a verdict in plaintiff's favor.

Defendant complains that it was error for the trial court to refuse his offered Instruction No. D–1, which told the jury, in substance, that a seller of raw agricultural products does not impliedly war-

**40**

rant that such products are fit for animal consumption, and directed the jury to return its verdict in favor of defendant if they found that defendant had not expressly warranted the silage, and further found that the silage was a raw agricultural product and that defendant had no knowledge the silage was unfit for animal consumption. The trial court was justified in refusing the instruction. The law of implied warranty in this case relates to processed animal food—not raw agricultural products. To have given the instruction would have been misdirection and error.

 Defendant next insists that prejudicial error was committed when the trial court permitted plaintiff's counsel to state that defendant had taken a change of venue from the county where the case was originally filed, and to read defendant's application therefor to the jury. We believe defendant has no legitimate ground of complaint. The statement of plaintiff's counsel and the introduction of the change of venue application in evidence were invited by remarks of defendant's counsel made in his opening statement, as follows: "Now for some reason or another, which I don't know, that case hung fire for nearly four years, not any trial, nothing done about it at all for nearly four years". When the trial judge overruled defendant's objection to the introduction of the change of venue application, he made the following statement: "The purpose, as I understand, is to show why the case is just coming to trial and will have some bearing on why the case has been postponed from time to time". We will not disturb the trial court's ruling in a matter resting primarily within his sound discretion.

 Defendant's final contention is unique in that it is based on the fact that the jury awarded a small verdict. We quote the text of the point: "The evidence clearly shows that the defendant did not have a fair and impartial trial of the cause, and the verdict is against the greater weight of the credible evidence in the case.

The verdict is purely a compromise verdict, and is not justified under any theory". Defendant says, in argument, "The very fact that the jury brought in a verdict for only $7000.00 is conclusive proof that it is a compromise verdict, and not based on the evidence"; and, "if the jury had felt that plaintiff was telling the truth about the great loss to his dairy herd, the verdict should have been $26,000.00 or more". Defendant devotes the remainder of his argument to matters of defense addressable only to the jury. There is nothing in the record of the case to indicate that the verdict of the jury was compromised. It is true that the verdict is small, and that a much larger one would have been justified by the evidence touching plaintiff's loss and damage—a fact that gives defendant no cause to complain. The complaint would belong to plaintiff if he had chosen to assert it.

The judgment is affirmed.

All concur.