**UTAH COOPERATIVE ASSOCIATION,**
**Plaintiff and Respondent,**

v.

**EGBERT–HADERLIE HOG FARMS, INC.,**
**Defendant and Appellant.**

**No. 14223.**

Supreme Court of Utah.

May 25, 1976.

Philip C. Patterson, C. C. Patterson, Ogden, for defendant and appellant.

Michael R. Murphy, R. Jeffrey Taylor and Mark O. Van Wagoner, of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for plaintiff and respondent.

TUCKETT, Justice:

Plaintiff initiated these proceedings in the District Court of Salt Lake County seeking to recover on an open account for livestock feed sold to the defendant during the year 1973. Defendant counterclaimed, claiming that the feed was contaminated. The case was tried in the district court solely upon the defendant's counterclaim, and after a trial was had on

the issues raised by the counterclaim, the court directed a verdict in favor of the plaintiff. From the order of the court below directing the verdict the defendant appeals.

Defendant owns and operates a hog farm located near Spanish Fork, Utah. During the year 1973, the defendant had a herd of hogs averaging between 280 and 300 pounds in size. The operation is one which is pathogenic free as far as possible.

During the years between 1971 and through June 1973, plaintiff supplied to the defendant hog feed in accordance with a ration formula submitted to the plaintiff by the defendant. The basic components of the feed included ground corn, ground barley, soybean meal, with a meat base mix which was manufactured by Standard Chemical Company of Omaha, Nebraska. The meat base was manufactured under the brand name of "Mr. Meaty Mix," and that component was supplied to the plaintiff by the defendant. The meaty mix was incorporated into the feed in the proportion of 100 pounds to the ton, or five per cent. Other components of the feed were supplied by the plaintiff. The plaintiff processed the feed into pellets after it was mixed.

On June 27, 1973, plaintiff delivered in bulk several tons of feed which it placed in the defendant's storage bins. The bins were weather tight. The plaintiff mixed the feed according to a formula supplied by the defendant and was processed in accordance with a mixing order prepared by the plaintiff's personnel. Prior to the processing and delivery of the order on June 27, defendant delivered to the plaintiff's mill the required number of 50-pound bags of "Mr. Meaty Mix." After the hogs began feeding from the load of feed, the defendant's manager, Paul Haderlie, observed that the hogs were rooting pellets out of the self-feeders and onto the floor. The self-feeders were emptied, cleaned, and refilled with more of the food. Thereafter Haderlie observed that the hogs were again rooting out the pellets from the self-feed-

ers. Plaintiff was notified that something was wrong with the feed. Haderlie had observed that the feed pellets were of a dark off-color appearance and gave off a different odor than that emitted from prior shipments.

On and after July 3, 1973, approximately 20 per cent of the hogs developed diarrhea. Dr. Jon F. Hunter, a veterinarian of Spanish Fork, Utah, was called to the hog farm where he examined the infected hogs. Dr. Hunter took food samples from each of the three storage bins, and he also took fecal specimens from the infected hogs. He prescribed a medication to treat the diarrhea which had developed. Dr. Hunter forwarded the specimens and food samples to various laboratories for testing. The reports from the laboratories indicated that the hogs were suffering from a salmonella infection and that the food samples taken from one of the storage bins showed that salmonella was present.

The defendant discontinued the feeding of the hogs from feed which had been supplied by the plaintiff and procured feed from another mill. The defendant furnished to that mill Mr. Meaty Mix in 50-pound bags and from the same batch and lot number which had been used by the plaintiff in processing the feed it had supplied.

Dr. Hunter concluded after having received the laboratory tests from the samples and specimens forwarded to the laboratories by him that the feed had been contaminated. Dr. Hunter continued to treat the hogs during July and August of 1973, and the epidemic among the hogs gradually subsided.

As a result of the disease a number of the hogs died, and it was necessary to feed the hogs a longer period of time before they arrived at the weight at which they were usually marketed. Evidence also shows that farrowing operations were disrupted which resulted in further losses.

At the conclusion of the evidence the court directed the verdict against the defendant upon its counterclaim, and while the record does not disclose the grounds for

the reasoning on behalf of the trial court, we must assume that that court was of the opinion that the evidence was insufficient.

■ The defendant claims that the ruling of the court below was erroneous, and, on the other hand, the plaintiff claims that under the facts of this case, it is not liable in law under any implied warranty available to the defendant inasmuch as there was no express warranty, and that an implied warranty does not rise from the nature of the transaction. The evidence does not show that there was an express warranty by the seller so as to bring the transaction within the provisions of Section 70A–2–313, U.C.A. 1953; nevertheless, it does appear from the evidence there was an implied warranty inherent in the transaction.[1] Implied warranties are governed by the provisions of Section 70A–2–314, the pertinent part of which is as follows:

(1) Unless excluded or modified (Section 70A–3–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

\*    \*    \*    \*    \*    \*

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; . . .

■ In view of the fact that there had been a course of dealing between the plaintiff and the defendant for a period of approximately two years it must be inferred that the plaintiff knew of the purpose to which the feed was being put by the defendant, and the provisions of Section 70A–2–315, U.C.A.1953 applies to the transaction. The language of that section is as follows:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

■ It is not necessary that the defendant show absolute certainty that the source of infection among the hogs arose from the ingredients supplied by the plaintiff, but it is sufficient if there is substantial evidence to support the likelihood that the infection came from that source.[2] We are of the opinion that in this case there were circumstances shown in the evidence from which a jury could reasonably find that the contamination contained in the feed came from the components furnished by the plaintiff or that the contamination was a result of plaintiff's preparation of the feed and that contamination resulted from the processing.

The order of the court below directing a verdict is reversed, the case is remanded for a new trial. Appellant is entitled to costs.

HENRIOD, C. J., and CROCKETT and MAUGHAN, JJ., concur.

ELLETT, J., dissents.

---

1. *Thatcher Milling & Elevator Co. v. Campbell*, 64 Utah 422, 231 P. 621, decided under former Uniform Sales Act, Title 60, Chapter 1, U.C.A.1953. See also: *Pacific Mar. Schwabacher, Inc. v. Hydroswift Corp.* (Utah) 525 P.2d 615; *Larson v. Farmers' Warehouse Co.*, 161 Wash. 640, 297 P. 753;

*Dougherty v. Lee*, 74 Cal.App.2d 132, 168 P.2d 54; *Vlases v. Montgomery Ward & Co., Inc.*, 3 Cir., 377 F.2d 846; 81 A.L.R.2d 138.

2. *Finlayson v. Brady*, 121 Utah 204, 240 P. 2d 491.