[No. 28843. Department One. December 28, 1942.]

JOHN GEISNESS, *as Administrator, Respondent,* v. SCOW
BAY PACKING COMPANY, INC., *Appellant.*[1]

[1]Reported in 132 P. (2d) 740.

*Kerr, McCord & Carey* and *Stephen V. Carey,* for appellant.

*Graham K. Betts,* for respondent.

JEFFERS, J.—This action was brought by John Geisness, as ancillary administrator of the estate of Theoma Sturgill Wright, deceased, against Scow Bay Packing Company, Inc., in the superior court for King county, on or about May 20, 1939, to recover damages from defendant for the wrongful death of Theoma Wright, claimed to have been caused from eating canned salmon prepared and canned by defendant. The amended complaint, in substance, alleges that John Geisness is the duly appointed, qualified, and acting ancillary administrator of the estate of Theoma Wright, deceased, and has brought this action in behalf of the surviving husband and two minor children; that defendant is an Alaskan corporation, and was and is engaged in canning and packing salmon at its cannery near Petersburg, Alaska, and that it packed the salmon hereinafter referred to, labeled "Motor" brand. It is further alleged that, during the canning season of 1937, defendant canned and packed, and later distributed through the Appalachia Wholesale Company, of Appalachia, Wise county, Virginia, and H. M. Donnells, a retail merchant in Dorchester, Wise county, Virginia, certain canned salmon bearing the aforesaid label, which "had been so negligently prepared and canned that on the 21st day of May, 1938, the salmon was wholly unfit and dangerous for human consumption"; that, on the last date, Theoma Wright purchased a can of this salmon from H. M. Donnells, ate a portion thereof, and at about ten-thirty o'clock in the evening of that day, and as a natural and proximate result of its dangerous and poisonous condition, was immediately poisoned

thereby and contracted severe cramps and nausea, from which she suffered and died on May 27, 1938.

It was also alleged that Mrs. Wright had a normal life expectancy of 38.81 years, and that her husband and two minor children were dependent upon her for services, care, and counsel.

In compliance with a motion made by defendant, plaintiff filed a bill of particulars setting forth that the defendant's negligence consisted in canning and distributing for human consumption salmon which was nauseating, poisonous, and unfit for such use. The manner in which the salmon was prepared, and what caused the salmon to become unfit for human consumption, were unknown to plaintiff.

Defendant, by its answer, denied on information and belief the material allegations of the complaint, and denied positively that any salmon packed by it poisoned Theoma Wright, or that she was made ill, or that she died as a proximate result of eating salmon canned by defendant.

It was stipulated by the parties that the Virginia wrongful death statute is applicable to this action, which limits recovery, in any event, to ten thousand dollars.

The cause came on for hearing before the court and jury, and thereafter a verdict was returned in favor of plaintiff. Defendant moved for judgment notwithstanding the verdict, or for a new trial, and, these motions having been denied, judgment was entered on the verdict on April 22, 1942. From this judgment defendant has appealed.

Error is assigned in overruling appellant's challenge to the sufficiency of the evidence at the close of respondent's case and at the close of the case; in submitting the case to the jury; in giving instruction No. 10; in overruling appellant's motion for judgment not-

withstanding the verdict; in overruling appellant's motion for new trial; and in entering judgment on the verdict.

The greater part of the testimony was presented in the form of depositions taken in Virginia, to be used in the trial of this action, or in a suit against the same company for the death of Ralph Sturgill, a brother of Mrs. Wright. The latter action was dismissed, for reasons not material herein.

Theoma Wright was twenty-five years of age in the spring of 1938. It was stipulated that the salmon in H. M. Donnells' store in May, 1938, bearing the "Motor" brand, had been packed by appellant at its Petersburg cannery during the months of July and August, 1937. Kenneth Sturgill, a brother of Theoma Wright, had purchased two cans of "Motor" brand salmon from H. M. Donnells, on Saturday, May 21, 1938, at the request of Mrs. Wright's husband. On the evening of May 21, 1938, Theoma Wright, her husband, Paul Wright, their two minor children, and Bessie Wright, the sister of Mr. Wright, went to a revival meeting held in that community, around six-thirty o'clock. The meeting was over about ten o'clock. When the Wrights returned to their home, Paul Wright opened one of the cans of salmon theretofore purchased by Kenneth Sturgill, and put the contents in a bowl. The salmon was then rolled in flour by Theoma Wright, made into little cakes, and fried in lard. Paul Wright testified that he did not notice any peculiar odor or appearance in the salmon, and that it tasted all right. The can was not dented or swollen.

Theoma Wright, Paul Wright, Bessie Wright, and the two children all ate these salmon cakes made from one can of salmon, Bessie Wright eating only one cake, and Mr. Wright eating very little. It does not appear how much Theoma Wright or the children ate.

The only other food served at this meal was light bread, and Bessie Wright did not eat any of that. At about one-fifteen a. m., Theoma Wright awakened her husband, complaining of her stomach, and shortly thereafter she started to vomit. She remained ill and under the care of Dr. Jones until she died the following Friday.

Bessie Wright testified that, when she awakened Sunday morning following, she was ill, suffering with cramps in her stomach. Bessie had no doctor, and after walking to her home, remained in bed about two weeks, getting up only for Mrs. Wright's funeral. There was no further testimony as to the character of Bessie's illness, except her statement that she was pretty sick. Neither Mr. Wright nor the children became ill. It does not appear what Mrs. Wright or Bessie had eaten at other meals on Saturday prior to the late supper.

Kenneth Sturgill testified that, on Saturday, May 21, 1938, while the other members of his family were at the revival meeting hereinbefore referred to, he prepared some salmon cakes for his brother Ralph. It appears from the evidence that Ralph had purchased two cans of "Motor" brand salmon from H. M. Donnells' store the preceding day, and that the can from which the cakes were made was one of those so purchased. On the Saturday referred to, Ralph had bicycled to Norton, a town four or five miles from his home, and it was sometime after his return and at his request that Kenneth, around six-thirty o'clock, opened a can of salmon, made it into cakes, and fried them in lard. Ralph alone ate the entire can of salmon and two or three pieces of white bread. At about eight-thirty, Ralph awakened Kenneth, and at that time almost fainted. He was immediately helped to bed by Kenneth, and complained of cramps in his stomach, shortly thereafter beginning to vomit. Ralph con-

tinued to be seriously ill throughout the night, suffering from severe pains in his abdomen, and perspiring freely.

Several witnesses, including members of the family and friends who saw both Mrs. Wright and Ralph Sturgill during their illness, testified that they complained of severe pains in their stomachs, and they continued to vomit at intervals; that Theoma Wright had a pale yellow coloring. There was testimony that Ralph's face was a pale yellow color, and other testimony that he appeared to be flushed. There was testimony that both Mrs. Wright and her brother were apparently in good health prior to Saturday evening.

Dr. Jones was called to attend both Mrs. Wright and Ralph on Sunday morning. He testified that Ralph was sicker than his sister, and that both of them had a fever of about 101 degrees. On Monday when he called, Ralph's abdomen was very rigid, he was still vomiting and complaining of intense pains. Theoma Wright's symptoms were about the same, although less severe. He diagnosed both cases as food poisoning, a gastrointestinal upset, and treated them accordingly. The doctor prescribed calomel, to be followed by epsom salts.

On Tuesday, fearing that Ralph's condition might require surgical work, the doctor had him removed to the Norton General Hospital for examination. At the hospital, Ralph was given a thorough examination. As a result of an X ray and fluoroscope of the chest, Dr. Jones and Dr. Harshbarger found signs of the beginning of lobar pneumonia. The doctors, being of the opinion that the case was a medical one, and that Ralph could be taken care of at home as well as in the hospital, had him returned to his home, where he died the next morning. The death certificate filed by Dr. Jones showed cause of death "lobar pneumonia,"

but the doctor testified that, while immediate cause of death was lobar pneumonia, the contributing cause was food poisoning.

Dr. Jones testified that, on Wednesday, Theoma Wright had developed a frank pneumonia. Mrs. Wright died the following Friday. While the death certificate filed by Dr. Jones shows the cause of Mrs. Wright's death to be lobar pneumonia, he testified that the immediate cause of her death was lobar pneumonia, contributing cause food poisoning. The doctor, in answer to a hypothetical question, stated that he felt it was quite probable that neither Mrs. Wright nor her brother would have developed the pneumonia if they had not had the food poisoning.

Dr. Jones further testified that there are two types of food poisoning, one chemical, and the other bacteriological. The doctor was then asked the following question:

"Q. If there was a food poisoning in either of these cases was it the bacteriological type? A. I couldn't say positively. *There is a possibility that it might have been either one.*" (Italics ours.)

There was no bacteriological examination made of the excreta or vomitus of either Mrs. Wright or Ralph Sturgill, nor was there an autopsy in either case. The doctor further stated that, while nausea and vomiting are not symptomatic of pneumonia, they are concomitant events which occur frequently with pneumonia, depending on whether the person has eaten a lot of food. The doctor also testified that, when he first saw Mrs. Wright and Ralph, there were no signs of pneumonia that he could detect, although he admitted that pneumonia is often difficult to diagnose in its early stages.

During the doctor's examination, he was asked this question: "Would he [referring to Ralph] have con-

tracted the pneumonia which caused his death if he had not had the food poisoning?" to which he replied:

*"I couldn't say about that definitely. Almost any person has some*—practically every person has some pneumococci germs in their nose, throat and mouth, and they don't contract pneumonia unless they are debilitated or their resistance is lowered. There is likelihood that he might not have had pneumonia if he hadn't had this lowered resistance from the food poisoning." (Italics ours.)

The doctor did not seem to place much significance on the fact that three members of the Wright family who ate this salmon did not become ill, stating that he had seen cases where several people had partaken of the same food, and two or three would become severely ill and the others would not be affected.

The deposition of Mr. King, who had been a funeral director for thirty years, and who had charge of both bodies, was introduced by respondent. His testimony was to the effect that he had handled many cases where the sole cause of death was pneumonia, and that in those cases the bodies were not subject to the excessive purging which he witnessed in relation to the bodies of Theoma Wright and Ralph Sturgill. In other words, Mr. King found an unusual amount of gas in the intestines of Mrs. Wright and her brother, and it was this gas that caused the purging.

Dr. Feaman, of Seattle, called by respondent as an expert on lungs and heart, testified that, from the history of the cases obtained by hearing read the depositions of Mr. King and Dr. Jones, and upon the hypothetical questions asked him, he was of the opinion the pneumonia was caused by the lowered resistance of the parties due to nausea and vomiting. The doctor also stated that it is not usual in the early stages of pneumonia to have vomiting, nausea, and cramping. On cross-examination, the doctor was asked: "Well,

were you influenced in making up your opinion here by what you heard of the deposition of Doctor Jones?" to which he answered: "If those facts were accurate,— it is upon that basis that I draw my conclusion."

Because of the importance of this case, and because it turns upon the question of whether or not there is sufficient evidence to support the verdict, we have set out quite fully the evidence introduced by respondent.

At the close of respondent's case, appellant challenged the sufficiency of the evidence, and moved for a dismissal. This motion being denied, appellant then called Dr. Palmer, of Seattle, as an expert witness. Dr. Palmer testified that he had read the depositions of all of respondent's witnesses, and stated that, from the history of the cases thus obtained, he was of the opinion that the salmon eaten by Mrs. Wright and Ralph Sturgill on Saturday night was not the cause, or one of the causes, of the death of either of the parties from pneumonia. He was of the opinion they were suffering from a fulminating virulent type of lobar pneumonia, which may start with a chill, or it may start with nausea and vomiting, and, as it involves the pleura, it becomes extremely painful. It frequently happens that, in an involvement of the lower lobe of the right lung, the pain is referred to the abdomen, and diagnosis has been mistakenly made of acute appendicitis or acute gall bladder trouble. In reaching his conclusion, the doctor considered the acuteness of the onset, the extreme pain they suffered, the temperature they had, and the physical findings of the X ray in the case of Ralph Sturgill. The doctor described in detail the symptoms of the two most common types of food poisoning, stating that the incubation period for the infective type, formerly referred to as ptomaine poisoning, due to a microorganism, is seldom under four hours, and may be as late as nine days before the

symptoms show. The outstanding symptoms of this type are numbness of the legs, numbness of the arms, or numbness of both arms and legs. There may be spasmodic flexing of the hands, or twitching, or spasmodic flexing of the fingers, twitching of the face or the shoulders, pain and stiffness in the joints. The victim usually complains of dizziness, and delirium is a very common condition.

The other type of food poisoning is the so-called botulinus. That is due to an organism which forms spores, and is most frequently found in canned goods, principally in the home canned foods. It is characterized by an onset, usually in about twelve to twenty-four hours after the food is taken. The predominating symptom is the involvement of the upper portion of the nervous system. The throat becomes completely or partially paralyzed, and the victims are unable to swallow. They are desperately ill, but have no fever. The temperature is subnormal. It is difficult to get the bowels to move. The nervous mechanism of the bowels is paralyzed. They frequently complain of double vision, and their eyes may be crossed.

Dr. Palmer was asked:

"Now, what are the symptoms characteristic of botulism that you find were absent in those cases from reading the depositions?"

At this point, Mr. Betts, counsel for respondent, made an objection on the ground that there was no indication that this was botulism. It is true that Dr. Jones was unable to say what form of food poisoning these parties were afflicted with, nor did Dr. Feaman say they were afflicted with any particular type, but it would seem perfectly proper, in an endeavor to show that they were not so afflicted, to demonstrate that they did not have the symptoms of the two most common types of food poisoning.

Food poisoning may result from many things. In the instant case, it is claimed these people were poisoned from eating canned salmon, and there would seem to be considerable doubt cast upon the probative value of the testimony that they had food poisoning from eating the salmon, unless it were shown that they were afflicted with a type of food poisoning commonly found in canned fish. The objection was overruled, and Dr. Palmer continued, stating that the absence of those symptoms led him to believe that Mrs. Wright and Ralph Sturgill did not suffer from food poisoning.

Appellant also called E. O. Paup, associated with P. E. Harris & Co., which firm acted as broker and sales agent for appellant during the season of 1937. During that season, Mr. Paup was the sales manager, and all complaints made as to any salmon distributed were directed to him. From the records of the company, he testified that two hundred cases, or ninety-six hundred cans, of "Motor" brand salmon were shipped to Bluefield, Virginia, from which source Mr. Donnells obtained his supply, and that no complaints had been made of any of these cans except the two in question here.

Appellant's assignments of error Nos. 1, 2, 3, 5, and 7 all present the same problem, namely, a challenge to the sufficiency of the evidence to sustain the judgment. In considering these assignments of error, we have in mind the often repeated rule that a challenge to the sufficiency of the evidence admits the truth of the plaintiff's evidence, and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant and in the light most favorable to the plaintiff. *Lindberg v. Steele,* 5 Wn. (2d) 54, 104 P. (2d) 940.

While the purported cause of action stated in the amended complaint seems to be based on negligence,

the case has been argued here primarily on the theory of implied warranty, and it will be discussed from that viewpoint.

It was contended in the case of *Flessher v. Carstens Packing Co.*, 93 Wash. 48, 160 Pac. 14, that the complaint, as construed on a former appeal, sounded in tort through negligence, and the plaintiff was erroneously permitted to recover only on the theory of implied warranty resting in contract, which was not specifically pleaded, and that, in any event, no negligence was established, in that there was neither allegation nor proof that the defendant knew that the meat in question was unwholesome. In answering this contention, we stated:

· "As to the first ground, it is a sufficient answer to say that, where there is a positive duty created by implication of law independent of the contract, though arising out of a relation or state of facts created by the contract, an action on the case as for a tort will lie for a violation or disregard of that duty. [Citing cases] The implied warranty of the wholesomeness of food placed on sale, whenever it exists at all, arises as an implication of the common law. 'The liability does not rest so much upon an implied contract as upon a violation or neglect of a duty voluntarily assumed.' [Citing cases] In such a case, it is sufficient to set forth the facts from which the duty springs, the neglect of that duty, and resulting injury. It is not necessary to aver in terms the existence of the relation which in law casts the duty upon the vendor, or that he knew of the injurious quality of the food. . . . Respondent, having pleaded the facts, was not required to plead the warranty as a legal conclusion in order to rely upon it."

We are of the opinion that the amended complaint in the instant case was sufficiently broad to permit a recovery on the theory of implied warranty.

We have also held that, in the absence of an express warranty of quality, a manufacturer of food

14

products, under modern conditions, impliedly warrants that his goods are wholesome and fit for human consumption, and that such warranty is available to all who may be damaged by reason of their use in the legitimate channels of trade. The ultimate consumer may, because of the breach of warranty, recover against the manufacturer or packer, as well as against his immediate vendor, despite the lack of privity. *Mazetti v. Armour & Co.,* 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C, 140; *Flessher v. Carstens Packing Co.,* 93 Wash. 48, 160 Pac. 14; *Nelson v. West Coast Dairy Co.,* 5 Wn. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606.

The plaintiff has the burden to establish not only the facts from which the warranty springs, but also the facts which show a breach of warranty, i. e., the plaintiff must establish that the food was in fact unwholesome.

The unwholesome character of food is not established, nor is a *prima facie* case made, merely by showing that the plaintiff became sick after eating it. *Poovey v. International Sugar Feed Number Two Co.,* 191 N. C. 722, 133 S. E. 12; *Gracey v. Waldorf System,* 251 Mass. 76, 146 N. E. 232. We might add that the rule last above announced seems to be universal.

It has also been held that, in order to hold the manufacturer or packer liable, it must be shown that the food was unwholesome at the time the original package was opened, so that the possibility of contamination through some source not under the control of the manufacturer is excluded. *Bowman v. Woodway Stores,* 345 Ill. 110, 177 N. E. 727.

A verdict in favor of a plaintiff cannot be made to rest upon mere speculation or conjecture, and the evidence must present something more than a mere possibility that an injury may have occurred. The facts necessary to establish a plaintiff's case on the

theory of implied warranty may be proved by circumstantial evidence.

After establishing the unwholesome character of the salmon, the causal connection between Mrs. Wright's death and the claimed poisonous food must be shown. It is not necessary that it be shown that the particular food was the only possible cause of the injury, but it is necessary to show that it was the most probable cause. *Nelson v. West Coast Dairy* Co., 5 Wn. (2d) 284, 105 P. (2d) 76; *Monahan v. Economy Grocery Stores Corporation,* 282 Mass. 548, 185 N. E. 34; *Miller v. W. T. Grant Co.,* 302 Mass. 429, 19 N. E. (2d) 704; *Mellace v. John P. Squire Co.,* 306 Mass. 515, 29 N. E. (2d) 26.

As the salmon was in a sealed container, it may be assumed that, if it was unwholesome, it was due to some failure on the part of appellant, as the contents could not have been contaminated after the salmon was packed.

There is certainly no direct proof in this record that the salmon was unwholesome and poisonous. No foreign or noxious substance was found in the can of salmon, nor was any laboratory test made of any of the salmon to determine if there was bacteria present, or if, in fact, the salmon was deteriorated. There was no evidence that it tasted peculiar or bad, but, in fact, there was affirmative showing that the salmon looked, smelled, and tasted all right.

Testimony that food, when eaten, tasted bad has in some cases been given considerable weight in justifying a conclusion that such food was in fact unfit for human consumption. *Smith v. Gerrish,* 256 Mass. 183, 152 N. E. 318; *Schuler v. Union News Co.,* 295 Mass. 350, 4 N. E. (2d) 465. And, conversely, at least where there was no direct evidence that the food was unwholesome, a lack of testimony showing the food tasted

bad, or that it had the appearance of being unfit for human consumption, or that it had a bad odor, has been recognized at least as being some indication that the food was not in fact unwholesome. In this connection and on the general question of the burden of proof, we desire to quote from the case of *Miller v. W. T. Grant Co., supra:*

"The burden of proving that her illness was due to unwholesomeness of the chop suey was an affirmative one resting on the plaintiff which could not be left to surmise, conjecture or imagination. While she was not bound to exclude every other possibility of cause for her illness, she was required to show by the evidence a greater likelihood that her illness resulted from unfitness or unwholesomeness of the food served to her by the defendant, rather than from a cause for which the defendant would not be liable. . . . We are of opinion that the evidence most favorable to the plaintiff did not afford a basis for more than a conjecture that her illness was due to an unfit condition of the chop suey. There was no evidence to show what other food the plaintiff. may have partaken of during the period testified to by the physician as the one of probable incubation in cases of ptomaine poisoning, except that the plaintiff's breakfast on the day involved had consisted of toast and tea. What she may have eaten between that time and the time when she ate the chop suey was left to conjecture. There was no evidence that the food 'tasted bad,' or that it had the appearance of unfitness. *Monahan v. Economy Grocery Stores Corp.,* 282 Mass. 548, 550-551, and cases cited. Nor was there evidence that any bad odor arose therefrom."

Respondent, in the instant case, has attempted to create an inference that the salmon was unwholesome, by showing that three persons who had eaten salmon of the same brand became ill, two of whom suffered from food poisoning, according to Dr. Jones, who attended them.

We recognize the difficulty of establishing a direct

evidence the deleterious character of a product such as canned salmon, and, as stated, we recognize that a breach of duty on the part of the manufacturer may be established by circumstantial evidence, but again we state a verdict cannot be made to rest on mere speculation or conjecture.

Accepting respondent's evidence as true, as of course we must, we are still of the opinion that respondent has failed to prove sufficient facts from which the jury could find that the salmon which Theoma Wright ate was unwholesome, or that she was poisoned as a result of eating it.

Respondent's case must be based primarily on the following facts: First, that Theoma Wright became sick after eating the salmon; second, that her doctor, who plainly was not an expert and had had little to do with food poisoning, on Sunday diagnosed her illness as food poisoning. He did not state that it was the type usually produced by unwholesome canned fish, nor even that it was the type usually produced by canned foods which had been improperly prepared. It seems to us it is only by basing inference on inference that the conclusion that this salmon was unwholesome can be reached.

Dr. Jones was never asked directly whether or not in his opinion the food poisoning was caused by eating the salmon. The nearest the testimony of the doctor comes to answering this question is found in his answer to the following question propounded on his direct examination:

"Q. Doctor, if these two young people were in normal good health on Saturday night, that each ate some canned salmon, each became violently ill within a few hours after eating this salmon and then their conditions were such as you found them and continued as you have described, and developed the pneumonia, which took their lives, would it be probable that the pneu-

monia would not have resulted except for the food poisoning which preceded it? A. I think it would have been quite probable."

We are of the opinion that all the doctor intended to say was that, if there had been no food poisoning, it was quite probable there would have been no pneumonia. If it was the intention of Dr. Jones to convey the idea that the food poisoning was caused by the salmon, we are clearly of the opinion such conclusion cannot be justified from the facts in this case. See *Reese v. Smith*, 9 Cal. (2d) 324, 70 P. (2d) 933. It was essential that there be some evidence that the salmon was unwholesome, or at least some evidence from which it could reasonably be inferred that it was unwholesome. The only evidence which might tend to show that the salmon was unwholesome, if other factors were present, is the fact that Mrs. Wright became ill after eating it. Sickness alone does not make a *prima facie* case that food eaten is unwholesome. It seems to us to permit a recovery on the evidence in this case would be to extend the rule far beyond any of the cases cited by respondent, or that we have been able to find, and we have read many in addition to those cited. We repeat that, if Dr. Jones and Dr. Feaman intended to convey an inference that the food poisoning was caused by eating the salmon, we are of the opinion such inference was not based upon facts, but was nothing more than speculation as to a possible cause.

Evidence was introduced to show that a brother, Ralph Sturgill, became ill after eating salmon of the same brand but from a different can. While it is true he exhibited symptoms similar to those of Theoma Wright, the weight of the evidence is subject to doubt. If he had eaten from the same can as his sister, this evidence would have had greater probative value. The fact that the salmon which he ate made him ill, if it

did, would not necessarily establish or tend to show that the other cans of the same brand were unwholesome. This fact might have some probative value as tending to show that a certain "pack" was unwholesome, but, as there was proof in this case, undisputed, that no other complaints were made as to that season's pack, it is not persuasive on that theory.

We again call attention to the utter lack of evidence as to what Mrs. Wright, Bessie Wright, and Ralph Sturgill had eaten at other meals that day or the preceding day.

It should also be kept in mind that Paul Wright, the husband, and two minor children ate salmon from the same can as Theoma Wright, and did not become ill. This, of course, is only a factor to be considered in arriving at our conclusion that there is insufficient evidence in this case to warrant a holding that the salmon eaten by Theoma Wright caused her food poisoning.

However, if it be conceded, for the sake of argument only, that Theoma Wright did suffer from food poisoning as a result of the unwholesome condition of the salmon, we are still of the opinion that the motion for judgment notwithstanding the verdict should have been granted, because of respondent's failure to establish a causal connection between the subsequent death, due to lobar pneumonia, and the food poisoning.

While it may be assumed that a manufacturer or canner is liable for all damages which are the natural result of a breach of warranty *(Mazetti v. Armour & Co., supra)*, there must be some direct relation between the injury and the alleged cause. Therefore, if it were shown herein that the pneumonia, which was the immediate cause of death, resulted from the food poisoning, recovery could be allowed. However, the only proof that respondent offered here is the statement of Dr. Jones hereinbefore set out, the statement of Dr.

Feaman hereinafter set out, and Dr. Jones' answer to the following question:

"Q. Would he [referring to Ralph Sturgill] have contracted the pneumonia which caused his death if he had not had the food poisoning? A. I couldn't say about that definitely. Almost any person has some— practically every person has some pneumococci germs in their nose, throat and mouth, and they don't contract pneumonia unless they are debilitated or their resistance is lowered. There is likelihood that he might not have had pneumonia if he hadn't had this lowered resistance from the food poisoning. You couldn't say positive about that. Most cases of pneumonia don't just strike when you are in good condition, there is a predisposing factor; exposure or some debilitating condition, so that the pneumococci germs can produce a pneumonia."

Dr. Feaman, in answer to a hypothetical question, testified that in his opinion the lowered resistance of Mrs. Wright, resulting from the nausea and vomiting, was the cause of the pneumonia. The doctor further testified that he had read the deposition of Dr. Jones, and that his answer was based upon that deposition, assuming as he did that the facts therein related were accurate.

The testimony of Dr. Feaman, in our opinion, tends to show nothing except that Mrs. Wright became sick from some cause, that she was nauseated and vomited, and that those things lowered her resistance and caused her to contract pneumonia.

It seems to us that the most which can be claimed for the testimony of Drs. Jones and Feaman is that it indicates there was a possibility that Mrs. Wright suffered from food poisoning caused by eating salmon, and that it was not improbable that pneumonia resulted from her lowered resistance caused by the food poisoning.

We are of the opinion too much must be left to speculation and conjecture to warrant us in concluding that a cause of action was proven against appellant.

. Counsel for respondent has cited and relies upon the following Washington cases: *Mazetti v. Armour & Co., supra; Flessher v. Carstens Packing Co., supra;* and *Nelson v. West Coast Dairy Co., supra.* He also cites and relies on some authority from other jurisdictions, especially the cases of *Singer v. Zabelin,* 24 N. Y. S. (2d) 962, and *Armour & Co. v. Leasure,* 177 Md. 393, 9 A. (2d) 572. We have in this opinion referred to some of the above Washington cases, and we recognize the rules laid down therein. However, we are of the opinion the cases cited may all be distinguished from the instant case on the facts, and that the cited cases therefore are not controlling herein.

The case of *Nelson v. West Coast Dairy Co., supra,* which is the most recent decision of this court, is distinguishable on the facts, since in that case the undulant fever contracted by the plaintiff is often transmitted to people through raw milk obtained from cows infected with Bang's disease. As the plaintiff in the cited case had consumed raw milk obtained from herds afflicted with Bang's disease, and since it did not appear that there was any other feasible manner in which he could have contracted the fever, it was held the milk was the most probable cause. But in this case, Dr. Jones stated that pneumonia does not necessarily result from a gastro-intestinal upset, but as the germs are present in almost every person, any lowering of the resistance might permit the germs to develop into pneumonia.

In the *Flessher* case, *supra,* where it was claimed the injury resulted from eating dried beef, two doctors testified that in their opinion the plaintiff's sickness was caused by eating the meat.

In the *Mazetti* case, *supra,* the complaint alleged that in the center of the carton of food purchased was a foul, filthy, and poisonous substance. A demurrer to the complaint by Armour & Co. was sustained, and plaintiff appealed. It thus is apparent that on appeal this court had to assume that the canned tongue sold did contain a foul, filthy, and poisonous substance. The real question in the *Mazetti* case was whether a retailer who sold goods of Armour & Co. could bring an action for injury to his business and loss of reputation. We held that he could, although the plaintiff had purchased the goods from the Seattle Grocery Company, stating that a manufacturer of food products, under modern conditions, impliedly warrants his foods when dispensed in original packages, and that such warranty is available to all who may be damaged by reason of their use in the legitimate channels of trade.

In *Armour & Co. v. Leasure, supra,* a Dr. Williams, called by Miss Leasure, the plaintiff, testified positively that in his opinion Miss Leasure contracted botulism from eating corned beef which she had purchased from a grocery store, and which had been packed for Armour & Co. We desire to call attention to a statement found in the opinion in the cited case:

"So the fact that appellee became ill from eating bad food was not evidence that she became ill from eating bad meat prepared by the appellant, but if there was proof that she was made ill by appellant's bad meat, then an inference might be drawn that the meat was bad because appellant failed to exercise ordinary care to see that the produce was wholesome before it offered it for sale and consumption by the public."

While there was a conflict in the testimony in the cited case, Dr. Williams diagnosed Miss Leasure's ill-

ness as botulism, and stated it was caused by eating the corned beef.

The case of *Singer v. Zabelin, supra,* was tried to the court without a jury. The only facts which appear in the opinion are that the plaintiff purchased a can of salmon from a store operated by the defendant, Zabelin; that the salmon was opened in plaintiff's home the following day, and its contents used in making three sandwiches, one of which was eaten by Max Singer, another by his daughter, and a third by a guest. All who ate the salmon became ill. The opinion then states:

"From the evidence of the plaintiffs and their attending physician, I may find as a fact that both plaintiffs became ill as a result of eating the canned salmon, purchased as aforesaid, and which was unfit for human consumption."

What the evidence of plaintiffs or their attending physician was does not appear, other than as above stated.

For the reasons herein assigned, the trial court erred in refusing to grant appellant's motion for judgment notwithstanding the verdict. The judgment of the trial court is reversed, with instructions to dismiss the action.

ROBINSON, C. J., STEINERT, and SIMPSON, JJ., concur.

MILLARD, J., dissents.

---

February 5, 1943. Petition for rehearing denied.