BARNES, J., for the Court:
¶ 1. In this personal-injury case, Joe and Diane McGinty sued Grand Casinos of Mississippi Inc.-Biloxi (Grand Casinos) for negligence and breach of implied warranty of merchantability for serving them unfit food. The trial court granted Grand Casinos' motion for summary judgment, and the McGintys now appeal. We affirm the grant of summary judgment regarding the negligence claim but reverse and remand on breach of warranty.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. On September 20, 2004, the McGintys ate breakfast and a snack for lunch at their home in Brandon, Mississippi, before driving to the Mississippi Gulf Coast, where they were to be guests of the Grand Casinos-Biloxi. They were part of a group of casino patrons for whom the casino had arranged a trip from its Biloxi, Mississippi casino to a casino in Reno, Nevada. That night, they had dinner at LB's Steakhouse at the Grand Casino in Gulfport.[1] They each had prime rib and a glass of wine with dinner, and then they drove to the Grand Casino in Biloxi and checked into their hotel. There, they gambled for several hours and drank more wine, but ate no more food, before going to bed between 10:00 p.m. and midnight.
¶ 3. The McGintys awoke early the next morning and ate breakfast at 5:30 a.m. at the Island View Café inside the Grand Casino-Biloxi. Joe ordered "Mama's Eggs and Chops" which included two grilled pork chops. Joe took a bite of the pork chops, and "didn't like it"; so Diane finished the remainder. She did not remember the pork chops "tasting funny," but Joe did. Then they rode in a limousine provided by the Grand Casino to New Orleans, Louisiana, to catch a flight to Los Angeles, California. They each drank only *557 water in the limousine. In the vehicle, Diane began to feel nauseated. When they arrived at the airport, she experienced diarrhea. About an hour into the flight, Diane began vomiting. Joe, too, began to sweat profusely, feel nauseous, and become incontinent; so the flight attendants gave him oxygen and moved the couple to the back of the plane. Joe vomited and had diarrhea as well. Neither Diane nor Joe ate or drank anything on the airplane.
¶ 4. When the plane landed in Los Angeles, Joe was carried off the airplane on a stretcher by emergency medical technicians. Both Joe and Diane were transported to a local hospital by ambulance. On the way to the hospital, Diane began to vomit a large amount of blood. At a local hospital, Diane received two blood transfusions and had to be treated for an esophageal tear by electrocautery and medication. Joe was discharged from the hospital the same day, but Diane had to stay for three days. Diane stated no tests were taken for food poisoning at the hospital because the physician decided, due to her emergency condition, that he was not concerned about taking the time to run any tests. Upon returning home, Diane saw her family physician, Dr. Wade.
¶ 5. Prior medical records from before the incident from Dr. Wade's office in July 2004, which were entered into evidence, showed Diane suffers from a history of digestive problems. Two months before the alleged food poisoning, Dr. Wade noted Diane suffered from "abdominal pain within 30 minutes after eating which is chronic/recurring frequently, ... [c]rampy/colicky abdominal pain, diarrhea 15-30 minutes after eating which is chronic." Further, Diane indicated in medical records from March 2003 that she had vomited blood in the past, prior to the food-poisoning incident.
¶ 6. On October 18, 2004, Dr. Jerome Helman, her treating physician at the hospital in California during the incident, wrote a letter to Diane and enclosed her medical reports. He stated her "upper gastrointestinal bleeding was caused by the severe vomiting, which related to food and drink [she] had prior to the event."
¶ 7. On September 13, 2007, the McGintys filed suit against Grand Casinos for negligence in serving food improperly prepared, and breach of implied warranty of merchantability for serving food not fit for human consumption. In January 2012, Grand Casinos filed a motion for summary judgment, arguing the McGintys could not meet their burden of proof to establish a food-poisoning claim under Mississippi law because the McGintys did not present any lab analyses proving their illnesses were caused by tainted food eaten at the Grand Casinos, and offered insufficient medical expert testimony on causation. After a hearing, the trial court granted Grand Casinos' motion for summary judgment. The trial court opined that "the Mississippi Supreme Court has rejected the use of circumstantial evidence in food[-]poisoning cases," citing Goodwin v. Misticos, 207 Miss. 361, 42 So.2d 397 (1949), which the trial court found "virtually identical" to the present case. The trial court concluded that the McGintys failed to meet their burden of proof in establishing their claims. The McGintys timely appealed, raising one issue: whether the trial court applied an improper summary-judgment standard. The McGintys admitted they only provided circumstantial evidence, but argue it was sufficient to defeat summary judgment.
¶ 8. We find the trial court's conclusion, as it pertains to the negligence claim, was proper because there was no genuine issue of material fact as to whether Grand Casinos *558 breached its duty of care. Therefore, we affirm the judgment as to that claim.
¶ 9. However, we disagree with the trial court's conclusion with respect to the claim for breach of implied warranty of merchantability, finding there is sufficient evidence to allow a jury to reasonably infer the food consumed by the McGintys at the Grand Casinos' restaurant caused their illness. Therefore, we reverse the trial court's judgment and remand, as there is a genuine issue of material fact as to that claim.
STANDARD OF REVIEW
¶ 10. The standard of review for a trial court's grant or denial of summary judgment is de novo. Waggoner v. Williamson, 8 So.3d 147, 152 (¶ 11) (Miss.2009) (citing One S., Inc. v. Hollowell, 963 So.2d 1156, 1160 (¶ 6) (Miss.2007) ). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (citing M.R.C.P. 56(c) ). Stated differently, "where the non-movant fails to establish the existence of an essential element of that party's claim," summary judgment is appropriate. Pigg v. Express Hotel Partners, LLC, 991 So.2d 1197, 1199 (¶ 4) (Miss.2008). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting M.R.C.P. 56(e) ). "[T]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." Waggoner, 8 So.3d at 152 (¶ 11). "The moving party has the burden of demonstrating that no genuine issue of material fact(s) exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." Id. at 152-53 (¶ 11).
DISCUSSION
A. The Trial Court's Findings
¶ 11. In its conclusions of law, the trial court did not analyze the negligence and breach of implied warranty of merchantability claims separately, but appeared to combine them as one "food poisoning" claim under a negligence standard. The trial court found Goodwin particularly relevant and controlling, holding that Mississippi law requires "definitive proof of food poisoning which cannot be inferred from circumstantial evidence." Its order stated that for the McGintys to succeed on their claims, they were "required to (1) present evidence" that the food "was infected by poisonous bacteria," which could only be established by a chemical analysis, and (2) to provide evidence that the bacteria got into the food through a lack of care by Grand Casinos. The trial court also held that the McGintys must "present expert medical testimony to establish proximate causation, and the expert medical testimony must be based on more than just the history provided by the [McGintys]." The trial court concluded that the McGintys must provide, "[a]t a minimum, ... concrete evidence[,]" including laboratory tests linking the illness to the bacteria in the food, and that the McGintys' "case [was] based on speculation and conjecture."
B. Goodwin v. Misticos
¶ 12. The trial judge heavily relied on the facts of Goodwin, claiming they were "virtually identical" to the present case. We find Goodwin's facts analogous, but not identical. In Goodwin, a husband and wife both became violently ill after eating *559 corned beef at a restaurant two hours earlier. Goodwin, 207 Miss. at 371, 42 So.2d at 398. The husband was diagnosed with ptomaine poisoning and died as a result of his illness. Id. at 369, 42 So.2d at 397. The wife filed suit, alleging an inference of negligence could be drawn from the following evidence: the plaintiffs ate the corned beef at the restaurant, and the wife said it "doesn't taste right"; they became ill one and one-half hours later; the treating physician testified that ptomaine poisoning was the cause of the illnesses; and ptomaine poison is carried by eating food or drinking water. Id. at 379-80, 42 So.2d at 402-03.
¶ 13. The Goodwin court held:
[A] plaintiff, in order to recover, must, assuming that the action is not one for breach of warranty, establish carelessness or negligence on the part of the restaurant keeper, for to shift the burden upon mere proof of the injury would in effect impose the liability of an insurer upon the defendant.
Id. at 373, 42 So.2d at 399 (quoting 22 Am. Jur. 888 § 102) (emphasis added). As to the burden of proof, the Goodwin court further stated:
[T]he Court must assume as true everything which the evidence establishes either directly or by reasonable inferences [,] which the jury might reasonably draw from such evidence.... However, in the application of this last above mentioned rule, while the jury may accept a fact as true from testimony tending to establish that fact, and while the law may also reasonably infer another fact from a fact accepted as true, yet the rule extends no further, and it is not permitted to presume another fact from a fact presumed. A presumption cannot arise from another presumption.
Id. at 374-75, 42 So.2d at 400 (citations omitted). Thus, the Goodwin court held that for the standard of proof required in negligent-food-poisoning cases, "inference upon inference" will not be permitted when the facts sought to be established are "capable of more satisfactory proof by direct, or positive or demonstrative, evidence." Id. at 377, 42 So.2d at 401-02 (quoting Masonite Corp. v. Hill, 170 Miss. 158, 167, 154 So. 295, 298-99 (1934) ).[2]
*560 ¶ 14. The Goodwin court upheld the directed verdict in favor of the defendant restaurant. Applying the Masonite principles, it noted that the question of whether the husband ate or drank anything between the time he ate the corned beef and the time he saw his physician (two days later) and was diagnosed with ptomaine poisoning "was a fact capable of direct and demonstrative proof." Id. at 377-78, 42 So.2d at 402. Second, the presence of "poisonous bacteria" in the corned beef "was also one capable of direct and demonstrative proof by a chemical analysis." Id. at 378, 42 So.2d at 402. Finally, the fact of whether bacteria got into the meat "through lack of the required care on the part of the restaurateur [was] also capable of direct and demonstrative proof[.]" Id. The Goodwin court concluded that based on the facts, no inference upon inference would be permitted "that the bacteria got into the food or drink as a result of the negligence of the restaurateur." Id. at 380, 42 So.2d at 403.
¶ 15. However, what Goodwin does not say is that reasonable inferences may never be drawn in food-poisoning cases.
[N]egligence can arise only from failure to perform a duty owing to the injured person, and before there can be a recovery here against the restaurateur by Mrs. Goodwin, it must appear from the testimony, or by a reasonable inference, that can be reasonably drawn from the evidence that the appellees failed to perform the duty they owed to their customer, Mr. Goodwin.
Id. (emphasis added). Rather, it is only when those inferences are so attenuated ("inference upon inference") that more direct and satisfactory proof is required.
¶ 16. Further, the Goodwin court does not state that chemical analyses are always required in such cases. What the court actually said was: "From the proof the jury could reasonably find: (1) That Mr. Goodwin ate the corned beef; (2) in one and one-half hours he became ill; and (3) from these two proven facts the jury could reasonably infer there was a germ in the corned beef that made him sick. " Id. at 379, 42 So.2d at 402 (emphasis added). The court made this statement despite there being no "chemical analysis" of the corned beef.[3]
¶ 17. Finally, the Goodwin court clearly stated that the case was "not framed on any implied warranty that the food was wholesome and free from infection and fit for human consumption," nor did Mrs. Goodwin sue on implied warranty. Id. at 369, 388, 42 So.2d at 398, 407 (emphasis added). Therefore, the Court declined to rely on cases involving implied warranty, as "[t]hey have no application here." Id. at 370, 42 So.2d at 398. "The picture drawn in this opinion is upon the law of negligence and its appropriate action sounding in tort. This will throw all of the *561 law of suits upon implied warranties, and their appropriate action sounding in contract, beyond the borders of our discussion picture." Id. at 373, 42 So.2d at 399.
ANALYSIS OF CLAIMS
I. Negligence
¶ 18. The McGintys make several arguments regarding their claim of negligence: "definitive proof" is not needed; the cases cited by the trial court are factually distinguishable; and this Court should apply caselaw from other jurisdictions that hold circumstantial evidence is sufficient to survive summary judgment. We find these arguments without merit.
¶ 19. Under a negligence theory, the plaintiff must prove: (1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) damages; and (4) that the breach was the proximate cause of the damages sustained by the plaintiff. Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc., 519 So.2d 413, 416 (Miss.1988). Specifically, Goodwin emphasizes that to establish negligence in food-poisoning cases, the plaintiff must prove by a preponderance of evidence that the food was tainted "through lack of the required care on the part of the restaurateur...." Goodwin, 207 Miss. at 378, 42 So.2d at 402.
In order to hold the operator of a restaurant liable for an injury to his customer, sustained by serving to him food not suitable for human consumption, it must be shown that the restaurateur in the selection, preparation, cooking or serving of the food so injuring the customer did not use that degree of care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table.
Id. at 374, 42 So.2d at 400. "[N]egligence can arise only from failure to perform a duty owing to the injured person, and before there can be a recovery ... against the restaurateur by [the plaintiff], it must appear from the testimony, or by a reasonable inference, that can be reasonably drawn from the evidence that the [restaurateur] failed to perform the duty they owed to their customer...." Id. at 380, 42 So.2d at 403. Regarding food served at a restaurant, the burden of proof "is upon the person bringing the action to establish carelessness or negligence"; otherwise, the restaurateur would be considered an insurer, which the Goodwin court found improper for negligence actions. Id. at 382, 42 So.2d at 404.
¶ 20. With respect to the claim of negligence, Mississippi law requires the McGintys prove the casino served tainted food because it failed in its duty of care regarding the preparation of the food. "[N]egligence can arise only from failure to perform a duty owing to the injured person...." Goodwin, 207 Miss. at 380, 42 So.2d at 403. The McGintys asserted that the following circumstantial evidence created a sufficient causal link to avoid summary judgment for negligence: (1) they tasted a pork chop at a Grand Casinos' restaurant, and Joe thought it tasted bad; (2) hours after tasting the pork chop, they experienced vomiting and diarrhea; and (3) over three weeks after they experienced these symptoms, a physician wrote Diane a letter, stating her prior symptoms were "related to food and drink [she] had prior to the event."
¶ 21. We agree with the trial court that, based on Goodwin, the evidence is insufficient to support the McGintys' claim of negligent food poisoning. Just as in Goodwin, we cannot make "inference upon inference" that the food or drink, which allegedly made the McGintys sick, was tainted *562 as a result of the casino's negligence. Merely showing that the McGintys ate pork chops at the casino café, and they both became sick, is insufficient to establish negligence. Any other outcome would make the restaurant an insurer. See Goodwin, 207 Miss. at 382, 42 So.2d at 404. Therefore, the McGintys' negligence claim fails as a matter of law. Accordingly, the trial court's grant of summary judgment was appropriate for the negligence claim, and we affirm the judgment in part.[4]
II. Breach of Implied Warranty of Merchantability
¶ 22. The McGintys argue that there is a genuine issue of material fact regarding their claim of breach of implied warranty of merchantability. We agree. Regarding implied warranty of merchantability, the Mississippi Code provides in pertinent part:
[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
Miss.Code Ann. § 75-2-314(1) - (2) (Rev.2002).
To recover for breach of an implied warranty, the plaintiff must establish: (1) the defendant was a merchant which sold goods of the kind involved in the transaction, (2) that the defect was present when the product left the defendant's control, and (3) the injuries to the plaintiff were caused proximately by the defective nature of the goods.
CEF Enters. Inc. v. Betts, 838 So.2d 999, 1003 (¶ 15) (Miss.Ct.App.2003).
The Uniform Commercial Code ... makes it clear that the serving for value of food, to be consumed either on the premises or elsewhere, is a sale that gives rise to the implied warranty of merchantability. The implied warranty of a restaurant owner under the Code is that the food served to the customers is wholesome, contains no deleterious substance, and is fit for human consumption.
18 Williston on Contracts § 52:89 (4th ed.).
¶ 23. As already noted, the trial court did not analyze the negligence and breach-of-implied warranty-of-merchantability claims separately. The supreme court in Goodwin made it clear that the case did not concern a claim of breach of implied warranty of merchantability and stated that proof of the fact that the plaintiffs ate the alleged tainted food and were sick a short time later could allow a jury to "reasonably infer" that the meat was infected. See Goodwin, 207 Miss. at 379, 42 So.2d at 402. The court made this finding despite there being no chemical analyses of the meat and despite questioning the timing of the physician's examination of Goodwin.[5]
*563 Yet Grand Casinos contends that the plaintiffs must establish causation by expert testimony based upon more than the history provided by the patient. The Goodwin court did not indicate what part the physician's testimony played in its conclusion that the jury could reasonably infer the illness was caused by a "germ" in the corned beef. In fact, Grand Casinos cites Goodwin for the proposition that the physician's testimony is insufficient. Insufficient to prove negligence, yes; but not necessarily insufficient to prove causation.
¶ 24. From our review of the cases cited by the parties, and our own research, we conclude that no one element or type of evidence is controlling. Each case must be reviewed based upon a myriad of factors, with the ultimate determination being whether, based upon the unique facts of that case, a jury could reasonably infer the food was the cause of the plaintiff's illness.
¶ 25. A most detailed analysis of the type of evidence required in food-poisoning cases is found in Sarti v. Salt Creek Ltd., 167 Cal.App.4th 1187, 85 Cal.Rptr.3d 506 (2009). In that case, a panel of the California Court of Appeals was deciding whether to follow the rationale of a different panel in Minder v. Cielito Lindo Restaurant, 67 Cal.App.3d 1003, 136 Cal.Rptr. 915 (1977). The Sarti court agreed that proof of food poisoning " 'must go further' than mere after-the-restaurant illness." (i.e., "post hoc, ergo propter hoc," or "after the fact, therefore because of the fact"). Sarti, 85 Cal.Rptr.3d at 512. However, it disagreed with the "strong implication in the Minder analysis that food[-]poisoning cases are somehow unique in tort law," and asserted that food-poisoning cases require the basic elements of proof as other tort actions. Id. at 517. The court further observed that the "ideal factual situation" to prove food poisoning would involve these four elements:
[S]imultaneous illness of a group of people who eat the same food at the same time, all "patients" manifesting classic food poisoning symptoms, prompt investigation of suspect food (like potato salad left out too long), and "microscopic examination" of that food, which might show, for example, a staph infection, and which would correlate with the same infection sustained by the plaintiff.
Id. (citing 4 Frumer & Friedman, Products Liability § 48.06[2], p. 48-24). But it recognized that this type of ideal situation "will not always present itself to a court," noting such reasons as the plaintiff's recovery "to the point where recovery of the pathogenic bacteria is no longer possible and ... the food may not be available for bacteriological study, besides which, often doctors may decide that the illness is not serious enough to warrant the expense of such an investigation." Id. (quotations omitted).[6] The court, therefore, rejected any implication in Minder that "reasonable inferences" cannot be employed to prove a plaintiff's case involving food poisoning ( *564 Id. at 518.), but recognized that food-poisoning cases, "just as any other personal injury cases, often depend on expert testimony." Id. (quoting Frumer, § 48.06[3] ). Further, a plaintiff need not rule out all other possible causes of the illness in a food-poisoning case to prove causation, but must provide sufficient evidence to reasonably support the judgment. Id. at 518-19.
¶ 26. In Sarti, the appellate court reversed the trial court's grant of judgment notwithstanding the verdict to the restaurant on the breach-of-warranty claim and remanded for reinstatement of the patron's $3.25 million jury verdict ($725,000 in economic and $2.5 million in non-economic damages). The court found that while there was "plenty of substantial evidence" on which the jury could have based a verdict for the restaurant (friend who split the tuna appetizer did not get sick; restaurant's "great pains" to separate raw tuna from raw chicken to prevent cross-contamination and possibility that plaintiff, a supermarket checker, could have picked up the bacteria at work), it did not do so. Id. at 509. The plaintiff presented evidence that while the type of bacteria that caused her illness was not found in tuna, unless there had been cross-contamination with raw chicken, a report prepared by the health department a little less than a month after her meal identified four practices by the restaurant that could lead to cross-contamination. Id. The appellate court found that the type of expert testimony which linked the particular kind of food poisoning experienced by the plaintiff to a particular kind of health violation attributable to the restaurant distinguished the case from Minder, where there was no testimony making this link, and from cases where there was a positive exoneration of the defendant's food by the health department. Id. at 512, 522. The court noted that the restaurant "cited no substantial evidence requiring a finding " that the patron picked up the bacteria while checking groceries or by some other method; rather the court recalled that "it is the winning party after a jury trial, not the losing party, who gets the benefit of reasonable inferences from the evidence." Id. at 524.
¶ 27. As to evidence of taste or smell, the Supreme Court of Washington has noted:
Testimony that food, when eaten, tasted bad has in some cases been given considerable weight in justifying a conclusion that such food was in fact unfit for human consumption. And conversely, at least where there was no direct evidence that the food was unwholesome, a lack of testimony showing the food tasted bad, or that it had the appearance of being unfit for human consumption, or that it had a bad odor, had been recognized at least as being some indication that the food was not in fact unwholesome.
Geisness v. Scow Bay Packing Co., 16 Wash.2d 1, 132 P.2d 740, 747 (1942) (internal citations omitted). The Geisness court held that while the plaintiff is "not bound to exclude every other possibility of cause for her illness, she was required to show by the evidence a greater likelihood that her illness resulted from unfitness or unwholesomeness of the food served to her by the defendant, rather than from a cause for which the defendant would not be liable." Id. (quoting Miller v. W.T. Grant Co., 302 Mass. 429, 19 N.E.2d 704, 705 (1939) ). The court reversed the wrongful-death judgment against the manufacturer of canned salmon where there was no testimony that the salmon had any peculiar odor, appearance, or taste; three of the five persons who ate from the can did not become ill; there was no bacteriological examination made of the excreta or vomitus; there was no evidence that the deceased was afflicted with a type of food *565 poisoning commonly found in canned fish; and there was no evidence of what the deceased had eaten that day or the preceding day. The death certificate listed lobar pneumonia as the cause of death, but the treating physician opined that food poisoning was a contributing cause. The manufacturer, however, put on expert testimony that the symptoms exhibited by the deceased were not characteristic of either ptomaine poisoning or botulism, the two most common types of food poisoning, but were consistent with a virulent type of lobar pneumonia. Based upon these factors, the court found insufficient evidence to warrant a holding that the salmon eaten by the deceased caused her illness. Id. at 743-745, 748.
¶ 28. Grand Casinos relies heavily upon Doss v. NPC International, Inc., No. 4:09CV38, 2011 WL 754891 (N.D.Miss. Feb.24, 2011). In Doss, the United States District Court for the Northern District of Mississippi granted the defendant restaurant's summary-judgment motion on the negligence claim by nineteen individuals from a church group who became ill within one hour of eating chicken wings and pizza at the restaurant. The group had been fasting and had eaten nothing since the midnight before. Id. at *1. The court based its holding, in part, on the fact that no expert testimony regarding causation was provided and the plaintiffs' treating physician only offered testimony provided to the treating physician by the plaintiffs.[7] The medical records showed there was no conclusive diagnosis of food poisoning for any of the nineteen plaintiffs. Many of the plaintiffs just wanted to be "checked out" for food poisoning at the emergency room. One plaintiff was found to be pregnant, and another was diagnosed with "hysteria" after being exposed to undercooked food. The court determined that "[t]o conclude that [p]laintiffs suffered from gastroenteritis at the hands of undercooked food prepared by the [d]efedant would be speculative at best." Id. at *3. However, in addition to the lack of definitive diagnosis from the physician, the health department had tested the chicken that allegedly caused the plaintiffs' symptoms "but found it to be untainted"; and the health department report further noted that the bacteria that produce toxins that can cause gastrointestinal illness with a short incubation period are not the typical bacteria found in raw chicken. Id. at *2.
¶ 29. Two cases from the Southern District of Mississippi reached differing results. In L.W. ex rel. Ware v. Tyson Foods, Inc., No. 1:10cv330-LG-RHW, 2011 WL 3476574 (S.D.Miss. Aug.9, 2011), the United States District Court for the Southern District of Mississippi denied the defendants' motion for summary judgment in the breach-of-warranty case brought on behalf of a minor who became ill after eating the defendants' hamburger meat. The evidence showed that the only food *566 eaten by the minor before becoming ill was the hamburger meat; he became ill the night he ate the hamburger; his grandfather ate the hamburger and also became ill; and the minor eventually went to the hospital, where a stool culture tested positive for campylobacter bacteria and steptococcus pyogenes/Beta Group A. The district court found a genuine dispute of material fact as to whether the hamburger meat was defective despite the defendants' argument that the hamburger meat was not tested and the minor had "unspecified 'stomach problems' " prior to the current illness. Id. at *1-3.
¶ 30. In Forehand v. Ryan's Family Steak House, Inc., No. A.103CV672WJGMR, 2005 WL 1523381 (S.D.Miss. June 28, 2005), on the other hand, the United States District Court for the Southern District of Mississippi granted the restaurant's motion for summary judgment in a food-poisoning case where the plaintiff became ill after eating chicken wings as part of a Fathers' Day dinner. He had not noticed anything unusual about the wings when he ate them; he became sick the following day and did not go to the hospital for treatment until Thursday, when he was found to have salmonella poisoning. He did not have a sample of the wings for testing and knew of no other person who became ill after eating at the restaurant that day. The district court stated that "[p]roximate cause may be proven by the circumstances of a case if the circumstances permit a reasonable inference of a cause of injury for which the defendant is responsible, and excludes equally reasonable inferences of other causes for which the defendant is not responsible." The court found nothing other than the plaintiff's belief that the wings were the source of his illness and his physician's opinion formed from the history provided by the plaintiff himself. Id. at *1-4.
¶ 31. Based upon all of the factors, cited in the above cases, we conclude that a jury could reasonably infer that the pork chops caused the McGintys' illness. The McGintys purchased and consumed food (the "goods" or "product") prepared and sold by Grand Casinos (the "merchant") at the café. There is circumstantial evidence from which a jury could reasonably infer that the food was "defective." The McGintys both became sick shortly after eating breakfast at the café. Joe commented that the pork chops "tasted funny," and quit eating them after one bite, but Diane finished the chops. The McGintys did not eat anything else after this meal, and became sick shortly after their breakfast, and had not eaten anything else since dinner the night before. Dr. Helman wrote that Diane's illness was "related to food and drink" she had prior to the onset of the illness. Joe also testified that he had worked in the "food business" and the "incubation time for certain bacteria" was within the length of time he became ill. While Diane did have some preexisting gastrointestinal issues, both Diane and her husband became sick at the same time, and after eating the same food. Similar to Goodwin, the timing of the illnesses implies that the "germ" was in the food the McGintys had just eaten; in contrast to Doss, Grand Casinos has not provided any evidence exonerating its product as untainted or indicating that the McGintys' symptoms do not correspond to the type that would have occurred had the germ been in the pork chops.
¶ 32. We find there is sufficient circumstantial evidence to establish a reasonable inference the McGintys' illness was caused by tainted meat and to create a genuine issue of material fact for breach of implied warranty of merchantability. Accordingly, the trial court's grant of summary judgment for this claim was improper, and we *567 reverse in part and remand for further proceedings consistent with this opinion.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE APPELLEE.
LEE, C.J., IRVING, P.J., ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, J.

The trial court explained that prior to Hurricane Katrina, LB's Steakhouse was located at the Grand Casinos-Gulfport, not Biloxi (which is a separate legal entity). The McGintys only filed their complaint against Grand Casinos-Biloxi; they make no claim the food they ate at LB's caused them to become ill.

In Masonite, the plaintiff claimed he was burned by poisonous elements in creek water and "sought to establish these poisonous elements in the water by inference." Goodwin, 207 Miss. at 375, 42 So.2d at 400. The Masonite court declined to recognize the rule "so stated" that inference may not be based upon inference but instead determined that "in allowing inference upon inference, we should do so no further than the reasonable necessities of the case, in the interest of justice, require." Masonite, 170 Miss. at 167, 154 So. at 298. It noted that if the party "who has the burden of proof, has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, he must introduce that more explicit, direct, and satisfactory proof[.]" Id. Otherwise, he "suffer[s] the presumption that, if the more satisfactory evidence had been given, it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case, which the more obscure and uncertain evidence did not disclose." Id. The court concluded the presence of poisonous elements in the water "was a fact capable of direct and demonstrative proof by a chemical analysis of a sufficient sample of the water taken from the place where the alleged injury occurred and within a reasonable time thereafter [,]" noting the State's access to chemical experts who could make such an analysis. Id. at 167-68, 154 So. at 298.
Appellee, having the burden of proof, did not take this essential step, essential to the safe and satisfactory administration of justice, and, with a chain of inferences elongated and weakened by so many links as is the chain here, the presumption raised by that failure must be adjudged to turn the scales of judicial decision in favor of appellant. In other words, and to sum up what we have said, we shall allow in this jurisdiction the establishment of a case by inference upon inference so long as the ultimate inference, measured by legal standards, is without too much doubt, a safe and dependable probability; but no such inference upon inference will be permitted to prevail when the fact sought to be established by such inference upon inference is capable of more satisfactory proof by direct, or positive or demonstrative, evidence, within the reasonable power of the party holding the burden to produce. In thus prescribing, we secure the administration of justice in a more dependable way, and at the same time reconcile our holding with the real weight of authority.
Id. at 168, 154 So. at 298-99 (emphasis added).

The Goodwin court continued, however, that any further inference (i.e., that the germ "got into the corned beef through a negligent violation of ... duty by the restaurant keeper") could not be drawn. Id. at 378-79, 42 So.2d at 402-03.

The McGintys also argue that because the trial court based its decision on "ancient" pre-Rules of Civil Procedure cases such as Goodwin and John Morrell & Co. v. Shultz, 208 So.2d 906 (Miss.1968), which required "definite proof" to support food-poisoning claims, "the standard used by the trial court was too high." They also claim these cases are misguided regarding the summary judgment standard and inapplicable. We disagree. The trial court applied the proper standard when considering Grand Casinos' motion for summary judgment regarding the McGintys' negligence claim-Mississippi Rule of Civil Procedure 56.

Dr. Copeland was unable to attend to Goodwin for almost two whole days after Goodwin ate the corned beef, due to a sprained ankle of his own. The court noted that fact, along with the lack of evidence of what Goodwin consumed in the interval, as factors in the weak chain of inferences in that case.

In fact, in Rytter v. Parthenides, 53 Misc.2d 649, 279 N.Y.S.2d 690, 693 (N.Y.Civ.Ct.1966), the court dismissed the negative laboratory results as "not ... helpful" where, by the time the plaintiff arrived at the hospital, hours after the onset of his illness of vomiting and diarrhea, the stool sample was watery. Instead, the court concluded that (1) the plaintiff's testimony that the only meal he ate the day he became ill was at the defendant restaurant, (2) the plaintiff's further testimony that all the meals he ate the prior day were at home with his family and no one became ill, (3) the plaintiff's lack of history of illness, and (4) the physician's opinion that the cause of the plaintiff's illness was food eaten in the restaurant, were sufficient to find in favor of the plaintiff's claim of breach of implied warranty. Id.

Doss cited Shultz, 208 So.2d 906, for the proposition that medical opinions based strictly on the history related by the patient are insufficient to establish causation. Doss, 2011 WL 754891 at *2. In that case, the supreme court reversed the jury verdict for plaintiff who became ill after eating canned potted meat. Finding the evidence insufficient to support the verdict, the court noted that the plaintiff had "noticed nothing unusual about the appearance, taste, or odor of the potted meat"; neither the product nor the can was examined by the plaintiff or the doctor; so that the entire case rested upon the plaintiff's testimony as to what she thought caused her illness and the doctor's opinion based upon the history of the illness related to him by the plaintiff. Schultz, 208 So.2d at 907. On cross-examination, the physician had admitted that the gastroenteritis "could just as easily have resulted from other foods" the plaintiff had eaten or from a viral infection. Id.